# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6425 | **DATE** | 2/9/2004 |
| **CASE TITLE** | Richardson vs. Briley | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Minute order of 2/9/04 is vacated and removed from the docket. Clerk of Court is directed to enter the following corrected order. For the reasons set forth on the attached Memorandum Opinion and Order, the Court grants Richardson's petition for a writ of habeas corpus. Kenneth Briley is substituted as the respondent for James Schomig. Judgment is entered in favor of the petitioner. Respondent is directed to release Richardson unless, within 120 days of this order, the State of Illinois retries him.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | FEB 1 0 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 49 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | FEB 1 0 2004 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| OR6 | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 04 FEB 10 PM 2:30 | Date/time received in Central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FLOYD RICHARDSON,                          )
                                           )
      Petitioner,                        )
                                           )
                                           )
  vs.                                  )   **Case No. 00 C 6425**
                                           )
                                           )
KENNETH R. BRILEY, Warden,                 )
Pontiac Correctional Center,               )
    FEB 1 0 2004
                                           )
      Respondent.[1]               )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In May 1982, Floyd Richardson was charged with the April 1, 1980 armed robbery and

murder of George Vrabel, a clerk at Twin Food and Liquors on the south side of Chicago.

Richardson was convicted by a jury and was sentenced to death by the trial judge after waiving

his right to a jury at the penalty phase of his trial. It took Richardson a full eighteen years to

exhaust Illinois' appeal and post-conviction process. His death sentence was commuted on

January 2003 to a sentence of life without parole.[2] Today the Court grants Richardson's petition

---

[1] At the time he filed his petition, Richardson was incarcerated at Pontiac Correctional Center and thus named Pontiac's warden, James M. Schomig, as respondent. Richardson was subsequently transferred to Stateville Correctional Center. Stateville's warden, Kenneth R. Briley, is substituted as the respondent.

[2] On January 28, 2003, the Court entered an order directing the parties to advise the Court whether the commutation of Richardson's death sentence rendered moot any of his claims, and whether, in light of the commutation, Richardson wished to pursue his habeas corpus petition. Richardson thereafter advised that the commutation rendered moot his claim challenging the

(continued...)

for a writ of habeas corpus, finding that his conviction was tainted by intentional deception on the part of the prosecution that successfully tricked Richardson into deciding not to call a key eye witness who would have said that Richardson was not the man who robbed and murdered George Vrabel.

## Background

At 10:00 p.m. on April 1, 1980, a man entered Twin Foods and Liquors located at 2251 East 79th Street in Chicago, fatally shot store clerk George Vrabel, and escaped out the store's front door. Four nights later, on April 5, 1980, a man robbed a tavern located approximately one mile from Twin Foods. The robber shot and wounded tavern owner Thomas Fitzpatrick and fled.

Over two years later, on May 4, 1982, Chicago police officers responded to a call regarding a robbery in progress at 1640 East 79th Street. They arrested Richardson, who was seen near the scene of the robbery and matched the description of the suspect. After Richardson's arrest, detectives reopened the investigation into the Vrabel murder. Detectives John Solecki and Joseph DiGiacomo assembled a series of photographs of men roughly fitting the description of the suspect in Vrabel's murder, including Richardson's picture in the photo array. The detectives then showed the photo array in black and white – and later in color – to witnesses of the two 1980 robberies. Some of the witnesses also viewed a line-up. Several witnesses identified Richardson as the perpetrator of the April 1980 robberies, and Richardson was charged with the murder of George Vrabel.

*Evidence at Trial*

_____

[2](...continued)
constitutionality of the Illinois death penalty statute, and that he wished to continue to prosecute the remainder of his petition.

In April 1984, Richardson stood trial before then-Circuit Court of Cook County Judge George Marovich and a jury for the Vrabel murder and armed robbery. The prosecutors were Assistant State's Attorneys Henry Lazzaro and Jack Hynes, and the defense attorneys were Assistant Public Defenders Ronald Babb and Joseph McElligott.

Store clerk Shirley Bowden testified that at approximately 10:00 p.m. on April 1, 1980, she was working at Twin Foods when she noticed a man enter the store. The store was empty, except for five clerks and one other customer. Bowden testified that she noticed the man because, though it was not cold outside, he was "huddled up" with his coat collar turned up. The man walked within four feet of Bowden as he made his way back into the liquor department where George Vrabel worked as a clerk. Bowden then heard a shot, followed by the warning, "Stay down mother f----r. This is a stickup. Stay down." Bonnie Williams, another employee of the store, testified that she was told someone was robbing the store and then ducked behind the counter, getting up when she heard a shot. Both women looked toward the liquor department in time to see a man taking money out of the cash register. The man fled the liquor department and ran out the front door of the store, passing both Bowden and Williams. After the gunman left, Bowden contacted the police and went to the liquor department. She found Vrabel lying on the floor bleeding.

Bowden identified Floyd Richardson as the individual who committed the April 1, 1980 robbery and murder. She had not previously viewed a lineup or photo array. She stated that prior to April 1, she had seen Richardson in the neighborhood, though she conceded on cross examination that she had not reported that when interviewed by the police. Bonnie Williams testified that in the summer of 1982, police detectives came to her home and showed her a set of

-3-

black and white photos. She identified Richardson as the person who ran out of Twin Foods in April 1980. She also picked Richardson out of a color photo array shown to her at a later date. Richardson was the only person whose picture was in both arrays. At trial, Williams also identified Richardson as the gunman. She testified she had seen him once "in passing" before the murder.

The prosecution was permitted to introduce evidence regarding the April 5, 1980 tavern robbery based on ballistics evidence linking the two crimes. Specifically, Ernest Warner, a firearms examiner for the Chicago Police Department, testified that he examined bullets recovered from both the Twin Foods robbery and murder and from the April 5 tavern robbery. He concluded that the bullets all had been fired from the same gun, as they had the same class and individual characteristics.

Thomas Fitzpatrick, the victim of the April 5 robbery, testified for the prosecution. He stated that around 1:30 a.m. on April 5, 1980, he was in his tavern located at 7159 South Exchange Street in Chicago, approximately one mile from the location of George Vrabel's murder four nights earlier. As he was standing at the cash register, a man entered the tavern, waving a gun. The man said "this is a stickup" and jumped over the bar, shooting Fitzpatrick in the back when he tried to run. As Fitzpatrick lay on the ground face up, the assailant stood over him and demanded to know where the rest of the money was, but he then departed when Fitzpatrick told him there was no more money. Fitzpatrick testified that in May 1982, he tentatively identified Richardson as the gunman after viewing a photo array shown to him by police detectives. He then viewed a lineup and positively identified Richardson as the man who shot him. Fitzpatrick also identified Richardson in court as his assailant.

Tavern patron Ray Slagle also testified that he observed the robber on April 5. He testified that he picked Richardson's picture out of a photo array shown to him by police in September 1982 and identified Richardson from an in-person lineup on October 5, 1982. Slagle identified Richardson at trial as the robber.

The defense called detective John Solecki as a witness. Solecki testified that after interviewing witnesses to the Vrabel shooting, he sent a flash message from the scene describing the suspect as having a "full, trimmed beard."

At this point, Richardson's attorneys advised the trial judge that it was "possible" that they had another witness, and the judge excused the jury for a brief recess. The transcript of the trial reflects that the following colloquy then took place:

> THE COURT: Mr. McElligott and Mr. Babb, you indicated to me that you had another witness?
>
> MR. BABB: Possible.
>
> THE COURT: We will recess at this time.
>
> (Whereupon, a short recess was taken.)
>
> MR. LAZZARO: Your Honor, I just want to raise, on the record, that which has occurred in the last 20 or 25 minutes or so. Listed in a supplemental answer to discovery, which we gave to Counsel, was a name of a Floyd Butler that actually is Lloyd Butler. It's a typographical error and his real name is, in fact, a Leonard Butler. He just goes by the name of Lloyd. I have informed Counsel as to certain statements that Mr. Butler will give in rebuttal, if Myron Moses is called.
>
> He would deny telling Mr. Butler that shortly, within a matter of hours after the incident, that shortly within a matter of hours after the incident, that the person coming out the door was, in fact, Floyd Richardson, and I've informed Counsel that is the rebuttal testimony that I expect as to Mr. Butler. I have informed him that

|              |                                                                                                                                                                                 |
|--------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|              | Mr. Butler is, in fact, employed by the Rosemont Police Department and they can contact him there, if they have any questions.                                                   |
|              | I just want the record to show I'm, in fact, giving them that information if, in fact, Myron Moses is called as a witness. Is that correct, Counsel?                              |
| MR. BABB:    | Except, we don't intend to put him on to deny anything. We intend to put him on for the purpose of saying he knew Floyd Richardson and that was not Floyd Richardson that came out of there with a gun. |
| THE COURT:   | At which point, the cross examination –                                                                                                                                          |
| MR. LAZZARO: | Would be as to what he spoke to Mr. Butler, and I want the record to reflect that is the information that has been given to me by Mr. Butler.                                     |
| MR. BABB:    | And also, to be fair, Mr. Moses has been confronted with that, in our presence, and he denies that he said that to Mr. Butler, who is a brother of his girlfriend.               |
| MR. LAZZARO: | This is in the nature of further discovery. The believability, the voracity [sic] is for the jury.                                                                               |
| THE COURT:   | It's for somebody other than those of us who are in the room.                                                                                                                    |
| MR. BABB:    | We are simply not going to put him on today. We want to talk to Mr. Butler.                                                                                                      |
| THE COURT:   | What do you want me to do as far as this jury is concerned?                                                                                                                      |
| MR. BABB:    | Send them home.                                                                                                                                                                  |

Trial Tr. 631-33.[3] The trial judge recessed the trial for the day.

---

[3] Lest there be any confusion regarding prosecutor Lazzaro's less-than-clear syntax at the end of the long trial day, it is undisputed that he was advising counsel and the trial judge that if Moses were called by the defense to testify that the shooter was not Richardson, the prosecution would call Butler as a rebuttal witness to testify that Moses had told Butler that it *was* Richardson he had seen flee from the store. *See* Lazzaro Hrg. Tr. 30-31.

The next morning, following a conference regarding jury instructions, the defense called Richardson's mother to testify; she stated that Richardson never had a full beard, only a mustache and a goatee. The defense then rested without calling any additional witnesses. The record does not reflect any further discussion regarding Myron Moses, Leonard Butler, or the previous day's colloquy about them.

The jury found Richardson guilty of murder and armed robbery. Richardson had waived his right to a jury at the penalty phase. The prosecution offered evidence regarding Richardson's two prior convictions for armed robbery, as well as his prior convictions for felony theft, possession of a controlled substance and unlawful use of a weapon. The prosecution also offered evidence regarding seven arrests on charges that were subsequently dismissed. It also offered evidence regarding the May 4, 1982 attempted robbery committed by Richardson that had led to his arrest. Finally, the State presented evidence that Richardson had struck a correctional officer while incarcerated.

The defense offered mitigation evidence via testimony from Richardson's common law wife and his mother. Richardson's mother testified that after her husband's death when Richardson was a teenager, he helped look after his brothers and sisters. Richardson's wife testified that he loved her and that he tried to make a better life for her and their two children. Richardson also took the stand and denied shooting either Vrabel or Fitzpatrick.

After hearing the evidence, on May 10, 1984, the trial judge imposed a sentence of death. Richardson's conviction and sentence were affirmed by the Illinois Supreme Court on direct appeal in 1988, *People v. Richardson*, 123 Ill. 2d 322, 528 N.E.2d 612 (1988), and his petition for writ of certiorari was denied by the United States Supreme Court in March 1989. *Richardson*

*v. Illinois*, 489 U.S. 1100 (1989).

*Post Conviction Proceedings*

On January 7, 1991, Richardson filed a timely petition for relief pursuant to the Illinois

Post-Conviction Hearing Act, 725 ILCS 5/122-1. In the petition, Richardson alleged that his trial

counsel had rendered ineffective assistance by, among other things, failing to object to the

prosecution's use of its peremptory challenges to excuse prospective jurors who were black,

failing to call Myron Moses to testify that Richardson was not the assailant, and failing to present

significant mitigation evidence at the sentencing hearing. Richardson also raised the peremptory

challenge issue on its own merits, arguing that the prosecution had violated *Batson v.*

*Kentucky,* 476 U.S. 79 (1986). He also alleged that his appellate counsel had been ineffective for

failing to raise various points on direct appeal. The trial court dismissed the petition in March

1997 in a lengthy written order but without holding an evidentiary hearing.

On appeal to the Illinois Supreme Court, Richardson raised the *Batson* issue and claims

regarding his counsel's effectiveness with regard to sentencing. His only mention of his other

claims was in the form of a generalized argument that the trial court had erred in dismissing the

petition without holding a hearing. The Illinois Supreme Court affirmed the trial court's ruling in

2000, *People v. Richardson*, 189 Ill. 2d 401, 721 N.E.2d 362 (2000), and later that same year, the

United States Supreme Court denied Richardson's petition for certiorari. *Richardson v. Illinois*,

531 U.S. 871 (2000).

*Federal Habeas Corpus Petition*

New counsel were appointed to represent Richardson for the purpose of filing a federal

habeas corpus petition. In conducting their pre-filing investigation, counsel interviewed

Richardson's trial attorneys regarding their decision not to call Myron Moses to testify. However, neither Babb nor McElligott had retained any notes or records from the trial, the case file had been lost during the appeals process, and neither recalled the circumstances of their decision not to call Moses.

Counsel sent an investigator to interview Leonard Butler to determine what he could recall about his role as a potential rebuttal witness for the prosecution at Richardson's trial. Butler was located and confirmed that he is the brother of Annette Butler, Myron Moses' then girlfriend. Butler informed the investigator, however, that he had never discussed the Richardson case with prosecutors or defense counsel, and he denied ever hearing Moses identify Richardson as the Twin Foods perpetrator.

Counsel also located Myron Moses as part of their pre-filing investigation. Moses reiterated that he had seen the assailant flee Twin Foods on April 1, 1980, that he knew Floyd Richardson, and that Richardson was not the man he saw. Moses also stated that he had never told Leonard Butler that the man he saw leaving Twin Foods was Richardson.

In February 2001, Richardson petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Richardson asserted eight claims. First, he alleged that the prosecution had engaged in intentional misconduct violative of his due process rights by falsely telling the court and defense counsel that Leonard Butler had information that would impeach the exculpatory testimony of Myron Moses were Moses called to testify. Second, he alleged that his trial counsel had rendered constitutionally ineffective assistance by deciding not to call Moses without first investigating the prosecution's claims regarding Butler. Third, Richardson asserted that the eyewitness identifications presented by the prosecution were produced by unduly

suggestive procedures in violation of his due process rights. Fourth, Richardson alleged that the prosecution had improperly used its peremptory challenges in a racially discriminatory manner. Fifth, he alleged that the prosecution's introduction of evidence about the April 5, 1980 armed robbery rendered the trial unfair. Sixth, Richardson alleged that his trial counsel had rendered ineffective assistance at the penalty phase by failing to investigate and present significant mitigating evidence. Seventh, he asserted that his appellate counsel rendered ineffective assistance on direct appeal by failing to raise various issues; Richardson later withdrew this claim. Finally, Richardson asserted that the Illinois death penalty statute was unconstitutional; this claim was later rendered moot by the commutation of his death sentence.

Richardson supported his petition with several affidavits, all obtained by his appointed counsel in early 2001. Myron Moses stated, in substance, that he knew Richardson, he had seen the Twin Foods robber flee the store, and the man was not Richardson. Moses also stated that he had never told the police that the man could be Richardson and had never tentatively or positively identified Richardson as the offender, either from photographs or in a lineup. Moses also stated that "[a]t no time did I ever tell Leonard Butler that the person who ran out of Twin Liquors [sic] was Floyd Richardson." He stated that he had been able and willing to testify at Richardson's trial.

Richardson also submitted an affidavit from Leonard Butler. Butler stated that he was formerly employed by the Rosemont Police Department but said that he had never gone by the name "Lloyd" or "Floyd." He recalled the Chicago police coming to his home to show his sister a photo array. Butler stated that Moses, his sister's boyfriend at the time, had never told him (Butler) that Floyd Richardson was the person he had seen running from the liquor store. Butler

also swore that he had never told prosecutors or the police that Moses had said any such thing. Indeed, Butler said, he was never spoken to by a prosecutor; rather he had talked only to the police. Butler stated that neither Richardson's defense attorneys nor an investigator had ever spoken with him.

Richardson stated in an affidavit that he had understood his attorneys were planning to call Moses as a defense witness. But when it came time for Moses to testify, one of Richardson's attorneys (he believed it was McElligott) told him that if Moses testified, the prosecution would call Annette Butler's brother, a policeman, to testify that he had heard Moses tell Annette that it was Richardson he had seen fleeing the store. Richardson stated that he had told counsel that he thought they should call Moses anyway, but that counsel had stated that it would "look bad" for the defense if Leonard Butler were called in rebuttal. Richardson, relying on counsel's advice, agreed that Moses should not be called. He stated that his attorneys had not told him whether they had interviewed Leonard Butler or caused him to be interviewed.

Trial counsel Ronald Babb and Joseph McElligott both submitted affidavits stating that even after attempting to refresh their recollections, they could not recall why they had not called Moses to testify, whether they had spoken to Moses, or whether anyone on the defense side had interviewed Leonard Butler.

In answering Richardson's petition, respondent asserted that Richardson's prosecutorial misconduct claim had been procedurally defaulted and, in any event, lacked merit because the prosecutor had not made a misrepresentation and because, respondent argued, governmental misconduct does not constitute an independent basis for habeas corpus relief. Respondent argued that Richardson had procedurally defaulted his claim of ineffective assistance of trial counsel

because he had not included it in his post-conviction appeal; that Richardson was not entitled to an evidentiary hearing on the claim because he had failed to develop the factual predicate for the claim in state court; and that the claim was lacking in merit in any event.

Respondent asserted that the state court's rejection of the claim regarding identification procedures was based on a reasonable application of Supreme Court precedent. He argued that the *Batson* claim was procedurally defaulted; the claim regarding the admission of other crimes evidence had been procedurally defaulted and, in any event, lacked merit; and the claim of ineffective assistance of counsel at sentencing was likewise without merit.

*Evidentiary Hearing*

The Court determined, over respondent's objection, to hold an evidentiary hearing on Richardson's claims of prosecutorial misconduct and ineffective assistance of trial counsel at the trial's guilt phase. At the hearing, the Court heard testimony from Richardson, Myron Moses, Leonard Butler, Annette Butler, Pearl Cox (a store clerk who witnessed the Vrabel shooting), lead trial prosecutor Henry Lazzaro, former detective John Solecki, defense trial counsel Ronald Babb, and Thomas Peters, Richardson's attorney on his state post-conviction petition and the appeal from the denial of that petition.

Peters, an experienced criminal defense and plaintiff's civil rights attorney, said that in the course of his work on Richardson's post-conviction case he had reviewed the transcript of Richardson's trial, including the colloquy about Moses and Leonard Butler. He said that it had never occurred to him to doubt the veracity of the prosecutor's representations about Butler.

Myron Moses, now forty years old and the manager of a car dealership in Atlanta, Georgia, testified at the hearing. Moses stated that he knew Floyd Richardson prior to the time

-12-

of the Twin Foods robbery because they lived in the same neighborhood. At the time of the robbery, Moses was eighteen years old and working for his father at an optometry shop. He testified that on April 1, 1980, he and his girlfriend Annette Butler were walking toward Twin Foods when they heard gunshots. Moses saw a man run out of the store; he had the opportunity to observe the man's face before he veered away. The man was not Floyd Richardson; Moses said that he had been prepared to testify as such at Richardson's trial. Moses testified that at the request of the police, he had assisted them in preparing a composite sketch of the perpetrator.

Moses stated that about two years after the robbery, he was contacted by the prosecutor's office and, along with Annette Butler, was taken to a police station to view a lineup. Richardson was in the lineup. Among the exhibits admitted at the hearing was a report signed by detectives Solecki and DiGiacomo in which they represented that Moses, Annette Butler, and store employee Pearl Cox "all made tentative identification of Floyd Richardson" at the lineup. Moses testified, however, that he did not identify anyone from the lineup either positively or tentatively as the person he saw fleeing Twin Foods, and on cross examination he also denied telling the police that any of the people in the lineup looked similar to the perpetrator. Moses acknowledged that when he saw the lineup, he did not tell the police that he recognized Richardson; he stated, however, that he had been asked only if he saw the robber, not if he recognized any of the lineup participants. Moses said he had spoken with Richardson's defense attorneys at some point and expected to testify at his trial. He did not know why he was not called as a witness.

Floyd Richardson also testified at the hearing. Richardson stated that after the trial had been in progress for two or three days, attorney McElligott spoke with him in the courthouse

lockup. McElligott stated that if they called Myron Moses to testify, the prosecution would call

Moses's "brother in law" (Leonard Butler), who would testify that he had overheard Moses tell

Annette Butler that it was in fact Richardson he had seen come out of the store. Though

Richardson still wanted to call Moses, he ultimately agreed with McElligott's advice that it

would hurt his case if Moses were impeached by Butler. Richardson initially stated that he

believed that his conversation with McElligott had taken place on the same day as the

prosecutor's statement in court about Leonard Butler, and that he did not recall speaking with

defense counsel about Butler again the next day. On further questioning, however, Richardson

indicated uncertainty about the timing of the conversation with counsel.

Richardson's counsel also called Leonard Butler to testify at the hearing. At the time of

the hearing, Butler was forty-four years old and working for the Defense Department as an

aviation technician with a security clearance, assisting in training members of the National

Guard. Butler said that his nickname was "Bud" and that he had never gone by Lloyd or Floyd.

He initially heard of the Twin Foods robbery/murder in April 1980, perhaps the day after it

occurred. A couple of days later, police officers had come to his parents' house to show photos

of potential suspects to his sister, Annette Butler. The police also asked him if he recognized

anyone, and he said no. Butler stated that from 1984 through 1986, he had worked for the

Rosemont Police Department as a part-time auxiliary officer.

Butler testified that Myron Moses never told him that Richardson was the man he saw

running from the crime scene, that he had never overheard any conversation between Moses and

Annette to that effect, and that Annette had never told him that Moses had said anything along

those lines. Butler also stated that he never told the police or prosecutors that Moses had said he

had seen Richardson. Butler said he had reviewed the excerpt from the transcript of Richardson's trial in which the prosecutor had made representations about what Butler would say; he denied making the statements attributed to him. Butler said he had not been interviewed by Richardson's defense counsel in 1984. On cross examination, he stated that he had never spoken to attorneys for either side in Richardson's criminal case and did not recall the names of the prosecutors.

Butler admitted that in the early 1990's, he had submitted three monthly vouchers claiming unemployment compensation in which he said he was still unemployed even after he had found work. He was prosecuted for making false statements, pled guilty, and paid restitution. In 2001 he pled guilty to carrying a firearm, which he said had occurred when he was returning home from a shooting range.

Annette Butler also testified at the evidentiary hearing. She testified that she had not seen the face of the man who ran out of Twin Foods. Butler said that she had never told anyone that she could identify the perpetrator, and that she had never identified anyone either positively or tentatively. On cross examination, Butler denied seeing a lineup in 1982 and denied going to the police station with Moses in 1980.

Pearl Cox, a clerk at Twin Foods at the time of the robbery and currently a customer service representative for Blue Cross / Blue Shield, testified that she had not gotten a good look at the offender but rather saw only his gun and then dropped to the floor. Cox stated that she had seen a lineup but, contrary to the police report prepared by detectives Solecki and DiGiacomo, she said she had never identified anyone as the man she saw at the store, either positively or tentatively.

Respondent called Henry Lazzaro, the lead prosecutor at trial, to testify at the hearing. At the time of the hearing, Lazzaro was employed by the Defense Department's Office of General Counsel. Lazzaro Hrg. Tr. 2. Lazzaro testified that he had interviewed Moses, Annette Butler, and Pearl Cox. He stated that according to police reports, Moses had made a tentative identification of Richardson; Lazzaro claimed that he discussed this with Moses when he interviewed him around six months before Richardson's trial. *Id.* 5-6. Upon further questioning, Lazzaro said that when he brought this up with Moses, he was "uncooperative" and denied identifying anyone. *Id.* 25.

Lazzaro stated that he did not recall how he became aware of Leonard Butler, but that he likely obtained the name a number of months before trial, through interviews with other witnesses, as someone who had knowledge about the case. *Id.* 6-7, 23-24. Lazzaro acknowledged that he had identified Butler as "Floyd" Butler on his supplemental answer to the defendant's discovery requests filed with the court. *Id.* 7. Lazzaro asserted that at some point before filing the supplemental answer he spoke to Butler by telephone, and he claimed Butler used the name Floyd when they spoke. *Id.* 8, 22. He said that he spoke with Butler by phone again shortly before trial, and that Butler (who, Lazzaro said, advised at this point that his name was Leonard) told him he had spoken with Moses, who had said that Richardson was the perpetrator. *Id.* 8-9, 23, 29.

Lazzaro acknowledged that he was aware that his representation regarding Leonard Butler's possible rebuttal testimony might lead the defense not to call Myron Moses to testify. *Id.* 30. When asked why Butler's name was not disclosed to the defense prior to the supplemental discovery response served just before trial, Lazzaro testified that it was simply a

-16-

matter of housekeeping and that he had added Butler's name to the list of possible witnesses at that point to ensure there was no problem if he needed to call Butler to testify. *Id.* 32. Lazzaro said that his normal practice would have been to make notes of his conversation with a possible witness like Butler. *Id.* 33. He had been advised, however, that the prosecution's file from the case could not be found. *Id.* 33-34.

Retired detective John Solecki, who had led the investigation of George Vrabel's murder, also testified on behalf of respondent. Consistent with a report he had prepared that was introduced at the hearing, Solecki testified that Moses, Annette Butler, and Pearl Cox had viewed a lineup and had made tentative, though not positive, identifications of Richardson as the murderer. As to Pearl Cox, Solecki conceded (on direct examination) that she said she had "ducked" when she saw the man with the gun. On cross examination, Solecki was shown his report of the interview with Cox shortly after the murder; it stated that Cox reported that she "fell to the floor" after the offender told people not to move, and it said nothing about her seeing the man's face.

Solecki also claimed that Moses had identified Floyd Richardson from a photo array prior to seeing the line-up but had wanted to see a physical line-up. Upon further questioning, Solecki admitted that this purported photo identification by Moses was not mentioned in any police reports. Solecki also conceded that in a bulletin he had sent out the night after the murder, he reported that Moses had said he had never seen the perpetrator before.

Ronald Babb, one of Richardson's trial attorneys, testified that he did not recall the circumstances surrounding the decision not to call Moses at trial. He acknowledged that at the time of Richardson's trial, the public defender's office had investigators and other resources at its

-17-

disposal to interview witnesses if the need arose during trial.

## Discussion

*Evidentiary Hearing*

The Court first elaborates on its decision, over respondent's objection, to hold an evidentiary hearing on Richardson's prosecutorial misconduct and ineffective assistance of trial counsel claims. A provision added to § 2254 by the Anti-Terrorism and Effective Death Penalty Act (AEDPA) states that a federal court may not hold an evidentiary hearing on a claim "[i]f the [habeas corpus] applicant has failed to develop the factual basis of a claim in State court proceedings," with certain exceptions (including when the claim is based on a factual predicate that could not have been previously discovered through due diligence). 28 U.S.C. § 2254(e)(2). Section 2254(e)(2) does not preclude a hearing, however, if that failure "cannot be attributed to something the petitioner 'did or omitted.'" *Matheney v. Anderson*, 253 F.3d 1025, 1039 (7th Cir. 2001) (quoting *Burris v. Parke*, 116 F.3d 256, 258-59 (7th Cir. 1997)). Indeed, "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).

There is no question that the factual basis for Richardson's prosecutorial misconduct and ineffective assistance claims was not fully developed during the state post-conviction proceedings on his case. A fact critical to both claims is that Leonard Butler actually would not have testified that he overheard Myron Moses identify Richardson as the man he had seen flee Twin Foods. This fact establishes a material misrepresentation was made by the prosecutor at Richardson's trial, which a critical element of his due process claim, and it also provides a

crucial link in showing the prejudce necessary to his ineffective assistance claim. Richardson did not learn that Butler's testimony had been misrepresented until long after his opportunity to develop the record in state court had passed and thus did not present that evidence in connection with his state post-conviction petition.

If Richardson's post-conviction counsel had interviewed Butler, they presumably would have presented the resulting evidence to the state courts, and the record would have been developed more fully. But "[t]he relevant inquiry is ... not simply whether the petitioner theoretically could have discovered the evidence while he was still in the state forum, but whether he made appropriate efforts to locate and present that evidence to the state courts." *United States ex rel. Hampton v. Leibach,* 347 F.3d 219, 240 (7th Cir. 2003). The failure of Richardson's counsel to present the evidence regarding Leonard Butler was not fairly attributable to any lack of diligence on Richardson's part; rather, it resulted directly from his and his counsel's reliance on the prosecutor's false representations about Butler.

Under the circumstances, the factual basis of Richardson's current claims was not reasonably available to him during the state proceedings, and he therefore did not "fail" to develop his claims as that term is used in § 2254(e)(2). The statute does not bar a hearing on an undeveloped claim when a prosecutor has concealed facts critical to that claim; as the Supreme Court put it in *Williams v. Taylor,* "a person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance. Fault lies, in those circumstances, either with the person who interfered with the accomplishment of the act or with no one at all." *Williams,* 529 U.S. at 432. In this case there is no basis to conclude that Richardson's post-conviction counsel were negligent or anything less than diligent; rather their

further inquiry regarding the Myron Moses / Leonard Butler matter was effectively thwarted by their reasonable reliance on the veracity of the prosecutor's misrepresentations at trial.

*Factual Findings*

The Court makes the following findings of fact based on the testimony and documentary evidence and our assessment of the credibility of the witnesses after considering all the evidence and observing the witnesses as they testified. To the extent particular factors are mentioned in the ensuing discussion, they are not intended to be an exhaustive rendition of what the Court relied upon in finding as it did – demeanor, for example, is a largely intangible factor difficult to convey in written form. In making these findings, the Court has accounted for the fact that the pertinent events took place twenty years ago or more, a factor which obviously has a significant bearing on each of the witnesses' ability to recall the pertinent events.

The Court is persuaded that Moses and Annette Butler had at least as good as, and likely a better, opportunity to see the offender than the persons who identified Richardson at the trial – including both those from the April 1, 1980 murder and robbery and those from the April 5, 1980 robbery. The persons who saw the offender in the store and the tavern while the robberies were in progress were subject to several adverse factors that did not affect Moses or Annette Butler – in particular, the fact that the offender was visibly wielding a gun, and, at Twin Foods, was shooting the gun. Such factors can have a tendency to divert the attention of a witness from the face of the offender; these factors also led some of the Twin Foods witnesses, quite reasonably, to take cover, arguably preventing them from extended observation of the offender's face. Indeed the police evidently believed that Moses and Butler had the best opportunity of the various witnesses to see the face of the Twin Foods robber: their reports reflect that they asked

-20-

Moses and Butler, but not the other witnesses, to assist in preparing a composite sketch of the perpetrator.

The Court is convinced of the credibility of Moses' testimony that he got a good look at the fleeing offender and that the man was not Floyd Richardson; that he made no identification, tentative or otherwise, of Richardson from photographs or a lineup; and that he never said or suggested to anyone, including Annette Butler and Leonard Butler, that Richardson was the man he had seen. The hint from respondent that Moses may have had some motive to fabricate, barely breathed by respondent to begin with, is entirely unconvincing, and we reject it. There is nothing to suggest that Moses was anything more than an acquaintance of Richardson, and as a bystander, he had no stake whatsoever in the investigation and prosecution of the robbery. There is no plausible reason why Moses would have misrepresented to the police on April 2, 1980 that he had never before seen the perpetrator, and no indication that he might simply have been mistaken and later (such as, at the time of the lineup) realized his mistake. Moses, a completely disinterested person in both the underlying prosecution and the present case, likewise has no reason or motive to have lied in his testimony before this Court.

Annette Butler was considerably less believable. In particular, her denial that she had seen the face of the man who ran out of Twin Foods is rather emphatically undercut by the contemporaneous police reports indicating that she had returned to the store and reported that she had seen the offender run out. And there is no reason to disbelieve the police report to the extent it indicated that she had viewed a lineup (as opposed to whether she made an identification), which Butler likewise denied. Butler's denials likely are attributable largely to the desire not to get "involved." This appears to have been the case with Butler even in 1980, when she failed to

call the police to report what she observed even after telling a "Mr. Morgan" (likely a store employee) that she would do so.

The Court found Pearl Cox credible in her testimony that she essentially had no real opportunity to see the offender's face and that although she viewed a lineup, she made no identification, tentative or otherwise.

The Court found former detective John Solecki to be utterly lacking in credibility based both on his demeanor and the content of his testimony. Solecki's previously referenced police report stating that Moses, Annette Butler, and Cox all tentatively identified Richardson from a lineup appears to have been a complete fabrication; Moses and Cox were both thoroughly credible in their denials that they had done anything of the kind. In particular, the notion that Pearl Cox could have made any sort of an identification, even a tentative one, was almost *demonstrably* untrue based on her account of her actions during the robbery, as memorialized in the contemporaneously prepared police reports. At the hearing, in what was a fairly obvious effort to buttress his other testimony and the outcome of his investigation, Solecki attempted to embellish these purported "identifications" even further by making up a nonexistent photographic identification by Myron Moses. Even giving Solecki the benefit of the doubt, the Court is unable to attribute this to mistake, poor memory or the passage of time; it was, quite simply, an untruth.

The Court finds, as indicated earlier, that Myron Moses never told or suggested to Annette Butler, Leonard Butler, or anyone else that Floyd Richardson was the man he had seen. Leonard Butler's denial that he had heard Moses say anything of the kind and his denial that he had told police, prosecutors, or anyone else that he had heard this, were likewise believable. A

-22-

number of years after the trial of the Vrabel murder, Butler engaged in acts that do not speak well of his general credibility: specifically, he made false statements to obtain three months of unemployment benefits. But his testimony that he had never said what the prosecutor attributed to him at Richardson's trial was corroborated by Moses' testimony, which, as indicated above, was thoroughly credible. And though one could imagine the possibility that it was Butler, back in 1984, who fabricated the purported statement by Moses, there is no believable evidence to support such a claim.

Henry Lazzaro's claim that he had spoken directly with Butler was not credible. In this regard, the Court believed Butler's testimony that he had no conversations with any prosecutor. Had Lazzaro actually spoken directly to Butler as he represented at Richardson's trial, it is highly unlikely that he would have misstated Butler's first name in the prosecution's supplemental list of potential witnesses that he filed in the trial court. And rather than chalking up the misstatement to oversight, a scrivener's error, or a simple flub, Lazzaro, like Solecki, attempted an embellishment to buttress his overall story: he said that Butler had *told him* (Lazzaro) that he went by the nickname "Floyd." Lazzaro Hrg. Tr. 7-8. This was, quite simply, entirely lacking in credibility.[4] Lazzaro's statement was roughly the equivalent of a false exculpatory statement and as such was damaging to his credibility in the Court's eyes.

Lazzaro's overall credibility likewise was not helped by his recounting of the events surrounding his pretrial interview of Myron Moses. Lazzaro conceded that in that interview, Moses denied identifying anyone as the perpetrator. *Id.* 25. This statement contradicted the

_____

[4] Butler credibly testified that his nickname had been "Bud" and that he had never gone by "Lloyd" or "Floyd."

aforementioned police report prepared by Solecki and DiGiacomo regarding the lineup and tended to exculpate Richardson (who was in the lineup) in view of Moses's acquaintance with him. Yet Lazzaro soughed this off as mere "uncooperativeness" by Moses and did not disclose Moses' exculpatory statement to the defense – instead, he "located" Leonard Butler following an obviously an investigative effort to undermine Moses' credibility as a potential defense witness and then sprung Butler on the defense in the middle of trial. Completely aside from whether Lazzaro's failure to disclose Moses' denial of an identification was a *Brady / Giglio* violation, Lazzaro's handling of this did not speak well of his credibility as an officer of the court.

One additional matter came up during Lazzaro's testimony at the hearing that reflected his lack of credibility. He testified about a store clerk "who had not viewed a lineup or photographic lineup" who he decided to call at trial to eliminate the possibility of an argument that the lineups were suggestive. Lazzaro Hrg. Tr. 26. (This, it is clear from the trial transcript, was Shirley Bowden – her name was Shirley Williams at the time of trial – because the only other store clerk who testified was Bonnie Williams, who said she had viewed two different photo arrays. Tr. 553-55.) When asked shortly after this why he had not called Annette Butler to testify at trial, Lazzaro stated:

> When the clerk that I – that I tes- – that did not view – ... didn't see the lineup, she took the witness stand, and it was as dramatic a moment as you ever want to see in a trial, quite frankly. She got on the witness stand. She identified – she pointed to Mr. Richardson, and then I did not know the answer to this question. I asked her: How can you be so sure it was him? And her testimony at that point in time was to the effect: I knew him from around the high school or around the court, or the neighborhood, something to that fact, I knew him. At that point in time Mr. Richardson, in his chair, just slid down almost underneath the table. It was noticed by everybody in the courtroom, including the jurors, and I did not need any further witnesses. ... There was nothing further other than what I had promised in the opening statement that I had to put on at that time.

Lazzaro Hrg. Tr. 27-28. The Court did not find this testimony credible. First, it is unsupported by any reference in the record at trial, most particularly in closing and rebuttal argument, where one would expect Lazzaro to have mentioned this if it were true. Second, Lazzaro, contrary to his claim that he needed no further witnesses, *did* call other witnesses after Bowden, specifically Bonnie Williams and two witnesses from the tavern robbery. Third, Lazzaro testified that (like all effective trial lawyers) he personally interviewed the witnesses on cases he handled. *Id.* 13-14. Under the circumstances, the Court does not believe that he would have asked such a significant question to Bowden on the stand even though (as he testified) he "did not know the answer to this question," *id.* 27 – particularly when he knew Bowden had told the police she had never seen the offender in the store before. *See* Chicago Police Department Supplementary Report dated 4/2/80, p. 5 ("[a]ll of the witness related that they had never seen the offender in the store previous to this time"). Though the Court found Lazzaro lacked credibility completely apart from this episode, this supports our finding. It again appears that he tried to buttress his testimony by making up an incident, perhaps one he felt could not be refuted.

As indicated above, the Court has considered the possibility that it was Butler, not the prosecution, that made up the statement about Moses that was attributed to him. If so, this would undercut Richardson's due process claim. But this scenario is entirely implausible; there is no basis to believe that Butler would have made up such a statement out of whole cloth. He had no motive to do so that is so much as hinted at by the evidence or by respondent. And as the Court has found, Butler's testimony that he never attributed such a statement to Moses was entirely credible.

Respondent characterizes the scenario posited by Richardson as implausible and

unrealistic. The Court does not agree. Lazzaro conceded that he learned several months before

trial that Moses was a possible exculpatory witness – "uncooperative," as Lazzaro characterized

it. Even though it did not disclose Moses' exculpatory statement, it is logical to believe that the

prosecution would have made an effort to determine if it could attack his credibility. Given the

relationship between Moses and Annette Butler, it is reasonable to infer that the trial would have

led the prosecution or detectives acting at its direction to return to her, and there to learn that

Butler's brother was a police officer. The prosecution evidently believed that it could get away

with falsely attributing to Leonard Butler a statement that, given Butler's law enforcement status,

would undermine Moses' value as a defense witness.

Why, however, would Lazzaro have falsely attributed the statement to Butler, if it could

be so easily refuted by simply talking to Butler? Respondent poses this question in arguing that

matters happened exactly as Lazzaro claimed. It must be recalled, however, that Lazzaro's

disclosure of Butler as a potential witness was made literally on the eve of trial, and his

disclosure of Butler's expected testimony was made even later, as the defense was preparing to

conclude its case. Even though Lazzaro may have had no obligation to disclose expected rebuttal

testimony sooner, it is reasonable to infer from the evidence, and the Court does infer, that he

timed the disclosure as he did with the aim of dissuading the defense from calling Moses.

Lazzaro may have believed that he could count on inertia or laziness on the part of Richardson's

defense counsel or the fact that they had precious little time to react, and that they would not

make an attempt to interview Butler.[5]  And even if the falsehood were discovered, the

---

[5] It is common in the criminal courts of this County for prosecutors and public defenders to be assigned to particular courtrooms for significant stretches. Attorneys in those positions

(continued...)

prosecution would be no worse off than it had been before; it could revert to attacking Moses based on the (made-up) "tentative" identification to which Solecki was presumably prepared to testify.

It is conceivable, though unlikely, that in making the representation at the trial, Lazzaro was relying on false information passed to him by Solecki or another detective rather than on personal contact with Leonard Butler. Even if so, however, Lazzaro's statement that *he* had spoken to Butler was false and represented a material fact intended and likely to influence defense counsel in how they dealt with the disclosure.

*Due Process / Prosecutorial Misconduct Claim*

Richardson's first claim is that he was denied due process of law by the prosecutor's false representations to defense counsel and the trial judge that he had spoken to Leonard Butler, and that Butler was waiting in the wings to destroy the credibility of Richardson's primary defense witness if Moses was called by the defense. For the reasons explained below, the Court rejects respondent's argument that Richardson's claim cannot be considered on the merits and concludes that the prosecution's conduct deprived Richardson of due process of law.

*Procedural default*

Respondent argues that the Court may not consider Richardson's claim on the merits because it has been procedurally defaulted. A procedural default occurs when the petitioner fails to present a claim to the state courts at the time, and in the way, required by the state. *See, e.g.,*

---

[5](...continued)
tend to learn their adversaries' strengths and weakness quite well. *See* Lazzaro Tr. 3, 11 (Lazzaro was assigned to Judge Marovich's courtroom and knew McElligott, the lead defense counsel, "from working in the courtroom with him for a couple of years.")

*Hogan v. McBride*, 74 F.3d 144, 146 (7th Cir. 1996). "As a general rule, habeas petitioners must first raise their claims during state proceedings." *Crivens v. Roth*, 172 F.3d 991, 995 (7th Cir. 1999). It is undisputed that Richardson did not raise his due process / prosecutorial misconduct claim in state court. A habeas corpus petitioner's procedural default may be excused, however, if the petitioner can show cause and prejudice for his failure to raise the claim in state court or if the default would lead to a fundamental miscarriage of justice. *See, e.g., Thomas v. McCaughtry*, 201 F.3d 995, 999 (7th Cir. 2000); *Steward v. Gilmore*, 80 F.3d 1205, 1211 (7th Cir. 1996).

Richardson argues that he can satisfy both the cause-and-prejudice standard and the fundamental miscarriage of justice standard. The Court need not address the latter issue, however, for Richardson has shown cause and prejudice. To satisfy the cause element, a petitioner must "show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Such factors can include a showing of interference by government officials or that the factual basis of a claim was not reasonably available. *Id.* at 494 (citing *Carrier*, 477 U.S. at 488).

The Seventh Circuit has made clear that a habeas corpus petitioner should not be punished for raising an issue for the first time in a federal habeas petition "that he was unable to present to the state courts because of the state's misconduct." *Crivens*, 172 F.3d at 995. Before trial, Crivens had requested the criminal records of the prosecution's witnesses; the state never turned over rap sheets for the witnesses who testified at Crivens' trial. After Crivens had exhausted his direct and post-conviction appeals in state court, he learned that one of the state's star witnesses had been convicted of possessing crack cocaine with intent to deliver it and

sentenced to thirty months probation before Crivens' trial. Crivens raised a *Brady* claim for the first time in his federal habeas petition, and the Seventh Circuit found he had cause that excused his default of the claim: "his failure resulted not from his own lack of attention or other fault, but rather because the state did not provide the information about [the witness's] criminal record until after the habeas petition was filed." *Id.* Similarly, Richardson argues that his failure to raise his due process claim in the state courts is attributable to the prosecution's misrepresentations, upon which his trial and post-conviction counsel relied.

Following the Seventh Circuit's lead in *Crivens*, the Court agrees that Richardson has established cause for his procedural default. *See also, Strickler v. Greene,* 527 U.S. 263, 283-84 (1999) (conduct attributable to the prosecution that impedes counsel's access to the factual basis for a claim is sufficient to establish cause for a procedural default). This is so even though Richardson's counsel were already aware that Moses had denied making the statements that the prosecutor said Butler had overheard.[6] To defense counsel assessing the issue mid-trial, Moses' denial did not preclude the possibility that he had actually made the statement, or that Butler could credibly though falsely testify that Moses had done so. The law of procedural default did not require counsel in this situation to assume that the prosecution was making it up. Even conscientious defense counsel do not have "a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." *Strickler,* 527 U.S. at 286.

It is true that Richardson's trial, appellate, and post-conviction counsel could have

---

[6] It appears from the colloquy involving Lazzaro, defense counsel, and the trial judge that defense counsel had asked Moses about the purported statement to Butler, perhaps during the recess that preceded the colloquy. *See* Tr. 632-33.

discovered the basis for the claim, as his habeas corpus counsel ultimately did, by interviewing Leonard Butler. But to establish cause an external factor like the prosecutor's misrepresentations need only "impede" counsel's efforts to raise the claim, *see McCleskey,* 499 U.S. at 493; it need not render it impossible to raise the claim. *See, e.g., Crivens,* 172 F.3d at 997 (state's failure to disclose witness' criminal history constituted cause for not raising *Brady* claim in state courts, even though nothing prevented defense counsel from simply questioning the witness while on the stand); *see also, Amadeo v. Zant,* 486 U.S. 214, 224 (1988) (evidence that a memorandum important to petitioner's claim was buried in a large quantity of documents supported finding that the memorandum was not "readily discoverable" if petitioner's counsel had investigated the claim thoroughly). That is precisely the case here; the prosecutor's misrepresentation impeded Richardson from raising the present claim due to counsel's reliance on the prosecutor's veracity.

To show prejudice of the sort needed to excuse a procedural default, Richardson must show that, absent the conduct in question, there is a "reasonable probability" that the result of the trial would have been different absent the alleged improper conduct. *See Strickler,* 527 U.S. at 289. Richardson has made the necessary showing. The case against him included no inculpatory admissions and no physical evidence linking him to the crime; rather, it turned on whether the jury was convinced of his guilt beyond a reasonable doubt by the testimony given by the state's identification witnesses, Shirley Bowden, Bonnie Williams, Thomas Fitzpatrick, and Ray Slagle. But Richardson had a highly credible exculpatory witness ready to take the stand. Moses was prepared to testify that he knew Richardson from the neighborhood, that he saw the person who committed the Vrabel murder, and that the perpetrator was not Richardson. The defense decided not to use this powerful evidence as a direct result of the prosecutor's representation that Moses's

credibility effectively would be destroyed if he were called to testify.[7]

The Court finds there is a reasonable probability that Richardson would have been acquitted if he had not effectively been tricked into deciding not to call Moses. The prosecution's identification testimony was undoubtedly powerful, but it was not airtight. Shirley Bowden had never identified Richardson before she saw him sitting at the defense table at trial, and two years had passed before Bonnie Williams and Thomas Fitzpatrick made an identification. And the testimony of both Williams and Fitzpatrick, like that of Bowden, was subject to a significant possibility of error based on the usual factors that can make eyewitness identification testimony unreliable – the lack of a significant opportunity to see the perpetrator, focus on factors other than the perpetrator's face (i.e., the gun), and so on. Moses' testimony likewise was subject to some of these same factors (though there is no indication that the fleeing perpetrator was visibly holding a gun when Moses saw him), but there was significant evidence that, at least in the eyes of the police, he and Annette Butler had a much better opportunity to see the offender than did the witnesses who had been inside the store: once the police learned of Moses and Annette Butler, they asked *them* – not the in-store witnesses – to assist in the preparation of a composite sketch. *See* Chicago Police Department Supplementary Report dated 4/11/80. And if impeached on the grounds of the purported prior tentative identification, Moses' testimony potentially could have been corroborated by his earlier statement to the police that he

---

[7] Respondent tries to pass off trial counsel's decision not to call Moses as a strategic one based on *all* the impeachment evidence against Moses – not just the Butler testimony. For example, respondent points out that a police report indicated Moses had made a "tentative" identification of Richardson (a matter the Court has addressed above). However, the record makes clear that the defense was intending to call Moses until learning of Lazzaro's statements about Butler and that the prosecutor's statements were what tipped the scale against calling Moses.

had "never seen this person or the car in the area before," *see* Solecki & Martin memorandum dated 4/2/80, despite his prior acquaintance with Richardson.

Respondent argues that both Bowden and Williams likewise knew Richardson from the neighborhood and recognized him when they saw him. But as Richardson argues, the record could not be clearer that these witnesses *did not* recognize the perpetrator at the time of the robbery as someone they knew or had seen before. *See* Supplementary Report dated 4/2/80, p. 5 (reporting interviews of Bowden, Williams and others; "All of the witnesses related that they had never seen the offender in the store previous to this time."). Even though Williams later advised, over two years later after identifying Richardson, that she had seen him in the area before, *see* Supplementary Report dated 10/5/02, p. 3, this does not undermine the strength of the statements by Moses, the person with arguably the best view of the offender, that he knew Richardson and Richardson was not the man he had seen.

For these reasons, the Court finds that Richardson has adequately shown cause and prejudice. We therefore proceed to the merits of Richardson's prosecutorial misconduct claim.

*Legality of the prosecutor's conduct*

For more than 65 years, the Supreme Court has maintained that due process is violated when a prosecutor deliberately misleads a defendant to his prejudice. *See, e.g., Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (denial of due process occurs when a defendant is deprived of his liberty through "a deliberate deception of court and jury"); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942) (petitioner adequately alleged a constitutional violation with assertions that the State knowingly put on perjured testimony and threatened and intimidated a defense witness to suppress his testimony); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (state may not knowingly

-32-

use false evidence to obtain a conviction); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972) (*Brady* rule applies to impeachment evidence); *United States v. Agurs*, 427 U.S. 97, 107 (1976) (prosecutors must provide defense with exculpatory evidence even if it's not requested by the defendant).

Respondent argues that even if Lazzaro's statements were false, Richardson's due process rights were not violated because Lazzaro's comments were mere "predictions" of future testimony; no false testimony was presented to the jury. Though *Pyle* and *Napue* specifically address the prosecution's presentation of and failure to correct false testimony, the Supreme Court and federal appellate courts have continuously read *Mooney* and its progeny broadly, rejecting the narrow construction of due process – and the duties of prosecutors – favored by respondent.

Indeed, the Supreme Court has recognized that "criminal defendants are entitled to much more than protection against perjury." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *Id.* The Supreme Court interprets fundamental fairness as requiring "that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Id.* Thus prosecutors have a constitutional duty, among other things, to turn over evidence favorable to the defense when requested, *e.g., Brady*, 373 U.S. at 87, and exculpatory evidence even if the defense does not request it. *Agurs*, 427 U.S. at 107.

They cannot use pre-indictment delay that substantially prejudices the defendant as "an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324 (1971). Prosecutors cannot threaten and intimidate defense witnesses to prevent them from testifying. *Pyle*, 317 U.S. at 216. And courts are "entitled to expect candor from attorneys representing the United States."[8] *United States v. Ott*, 489 F.2d 872, 874 (7th Cir. 1973) (reversing conviction because the prosecutor made a material misrepresentation to the trial court to persuade the court to make a ruling in the government's favor). *See also United States v. Bernal-Obeso*, 989 F.2d 331, 334 (9th Cir. 1993) ("[W]e expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery."); *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988) (reversal of conviction warranted where prosecutor violated "her overriding duty of candor to the court" by misrepresenting to the court that three of the state's witnesses had not been given immunity); *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962) ("The prosecution has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth.").

The prosecutor also owes candor to defense counsel. It is in keeping with *Mooney* that a prosecutor violates due process if an accused can show that "the prosecutor deliberately misled him." *Gray v. Netherland*, 518 U.S. 152, 165 (1996) (finding petitioner's allegation that the prosecutor had misled him as to the evidence the state would present at sentencing, if true, constituted a misrepresentation in violation of the petitioner's due process rights). *Brady* also prohibits prosecutors from making material misrepresentations to defense counsel. *See United*

---

[8] Although *Ott* dealt specifically with misrepresentations offered by a U.S. attorney, the court's need for candor applies equally to state prosecutors; there is no basis for holding state prosecutors to a lower standard than the Constitution demands of federal prosecutors.

*States v. Bagley*, 473 U.S. 667, 682-83 (1985).  The Supreme Court recognizes that a *Brady*

violation offends due process because it has the effect of misleadingly inducing the defense to

believe that the requested or exculpatory information does not exist and causing him "to make

pretrial and trial decisions on the basis of this assumption." *Id.* For example, when a prosecutor

withholds impeachment evidence, as was the case in *Bagley*, "the prosecutor's response to

respondent's discovery motion misleadingly induce[s] defense counsel to believe" that the state's

witnesses cannot be impeached. *Id.* at 683.  Court do not tolerate such behavior, which "casts the

prosecutor in the role of an architect of a proceeding that does not comport with standards of

justice." *Brady*, 373 U.S. at 88.

Prosecutorial candor is necessary to foster confidence in the outcome of trials. "[T]he

touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of

the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In

*United States v. Agurs*, "[t]he [Supreme] Court observed that the *Mooney* line of cases applied

this strict standard 'not just because they involve prosecutorial misconduct, but more importantly

because they involve a corruption of the truth-seeking function of the trial process.'" *Northern*

*Mariana Islands v. Bowie*, 243 F.3d 1109, 1116 (9th Cir. 2001) (quoting *Agurs*, 427 U.S. at 103).

Similarly, the purpose of the *Brady* line of cases is to prevent behavior that "'undermines

confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting

*Bagley*, 473 U.S. at 678).  To establish a *Brady* violation, the petitioner must demonstrate that the

evidence withheld by the prosecution is material, meaning a verdict achieved without the

evidence is not worthy of confidence. *Id.* at 434.

A defendant need not demonstrate that after discounting the inculpatory evidence

in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.* at 434-35 (footnote omitted). Thus prosecutorial misconduct may constitute a due process violation when it undermines confidence in the verdict.

In this case, Lazzaro knowingly misled defense counsel to believe that if they called Moses to the stand, Butler would destroy Moses' credibility. In *Pyle* the Supreme Court found that if proved, prosecutorial conduct that prevented a defense witness from testifying would constitute a due process violation. Lazzaro's conduct had the same effect as the intimidation alleged in *Pyle*: the prosecutor's actions prevented an exculpatory witness from testifying. "The atmosphere created by such tactics is one in which we highly doubt a defendant whose life or liberty is at stake can receive a fair trial." *Crivens*, 172 F.3d at 999 (finding prosecutor violated due process by withholding state witness's criminal record with the effect of misleading defense counsel to believe that the witness could not be impeached). The Court has already found that there is a reasonable probability that Richardson would have been acquitted if he had not been tricked into deciding not to call Moses. *See supra* at 29-30. For this reason, the prosecution's conduct violated Richardson's due process rights.

Respondent argues that even if Lazzaro's conduct violated due process, Richardson is not entitled to a reversal of his conviction because at the time of his direct appeal, the Supreme Court had not "'clearly established' the propositions essential to his position." *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999) (quoting *Mueller v. Sullivan*, 141 F.3d 1232, 1234 (7th Cir. 1998)).

The Seventh Circuit has recognized that since the advent of AEDPA, to obtain a writ of habeas corpus "[a] petitioner must have a Supreme Court case to support his claim, and that Supreme Court decision must have clearly established the relevant principle as of the time of his direct appeal." *Id.* Our previous discussion relying entirely on Supreme Court cases decided between 1935 and the 1970s undermines respondent's contention. For these reasons, Richardson is entitled to a writ of habeas corpus even under the heightened standard of AEDPA.

Citing *Teague v. Lane*, 489 U.S. 288 (1989), respondent makes the related argument that the rule upon which Richardson relies was not in effect at the time his conviction became final and, therefore, it cannot be applied retroactively to his case on collateral review. In *Teague* the Supreme Court gave two definitions of a new rule. One definition is that "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301 (emphasis in original). As explained above, the *Mooney* and *Brady* line of cases, which were decided long before Richardson's conviction became final, dictate the rule upon which this Court has relied. The second definition employed by the Supreme Court is that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Id.* The rule the Court applies today does not place a new obligation on the government. Since *Mooney* was decided in 1935, prosecutors have known that they cannot deceive the court; *Brady*, decided in 1963, made clear that they cannot make material misrepresentations to opposing counsel either. Respondent's claim that in 1982 prosecutors did not know that they could not make a material misrepresentation to defense attorneys for tactical advantage borders on the ridiculous. Because the Court does not rely on a new rule today, *Teague* does not bar Richardson's claim.

-37-

Furthermore, even were the Court relying on a new rule of criminal procedure, it could still be applied to Richardson's case because it would fall under the "watershed rules of criminal procedure" exception to *Teague*'s bar on retroactivity. *Id.* at 311. Under this exception, a new rule can be applied retroactively if the absence of the rule at trial "undermine[s] the fundamental fairness that must underlie a conviction or seriously diminish[es] the likelihood of obtaining an accurate conviction." *Id.* at 315. In *Teague* the petitioner argued that the Sixth Amendment requirement that the venire represent a fair cross section of the community applied to the petit jury. *Id.* at 299. The Court found that the new rule sought by the petitioner on collateral review did not fall within the watershed rule exception because the fair cross section requirement "'[does] not rest on the premise that every criminal trial, or any particular trial, [is] necessarily unfair because it [is] not conducted in accordance with what we determined to be the requirements of the Sixth Amendment.'" *Id.* at 315-16 (citing *Daniel v. Louisiana*, 420 U.S. 31, 32 (1975)). In contrast, prohibiting prosecutors from making material misrepresentations to induce the defense not to call an exculpatory witness rests on the premise that such material misrepresentations (1) result in fundamentally unfair trials in which the defendant is prevented from putting on a complete defense and (2) undermine confidence in the accuracy of the verdict. The rule the Court relies on today, even if new, would fall under the watershed rule exception. Therefore, *Teague* does not impede granting the writ on the ground that his right to due process was violated by Lazzaro's conduct.

*Richardson's Remaining Claims*

Because the Court has found the prosecution's conduct entitles Richardson to a writ of habeas corpus, it need not reach the merits of his ineffective assistance of counsel claim or his

other claims at this time. Though the preferred practice is to rule on all the grounds presented in a habeas corpus petition, *see Phifer v. Warden, United States Penitentiary, Terre Haute, Indiana,* 53 F.3d 859, 863 (7th Cir. 1995), this is not a categorical rule. Indeed, a district court's order granting a petition for writ of habeas corpus "is ordinarily considered a final judgment, even if the district court does not address all of the petitioner's claims." *Sprosty v. Buchler,* 79 F.3d 635, 645 (7th Cir. 1996) (citing *Phifer* and other cases). Richardson's remaining claims may be rendered effectively moot depending on whether an appeal is taken or the outcome of that appeal. Under the circumstances, the Court need not and does not address the remaining claims.

### Conclusion

For the reasons stated above, the Court grants Richardson's petition for a writ of habeas corpus. Kenneth Briley is substituted as the respondent for James Schomig. The Clerk is directed to enter a final judgment in favor of the petitioner. Respondent is directed to release Richardson unless, within 120 days of this order, the State of Illinois retries him.

MATTHEW F. KENNELLY
United States District Judge

Date: February 9, 2004

-39-