# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **FLOYD RICHARDSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 00 C 6425** |
| | ) | |
| **MARCUS HARDY, Warden,** | ) | |
| **Stateville Correctional Center,** | ) | |
| | ) | |
| **Respondent.**[1] | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Floyd Richardson was tried and convicted in 1984 of the April 1980 armed robbery and murder of George Vrabel, a clerk at a grocery store on the south side of Chicago. The trial judge sentenced Richardson to death after he waived his right to a jury at the penalty phase of his trial. In 2003, Illinois Governor George Ryan commuted Richardson's sentence to a sentence of life without parole.

In February 2004, this Court granted Richardson's petition for a writ of habeas corpus on the ground that his conviction was tainted by prosecutorial misconduct at his trial. On appeal, the Court of Appeals reversed, finding that Richardson had not been prejudiced by the alleged misconduct. *Richardson v. Briley*, 401 F.3d 794 (7th Cir. 2005). In August 2006, the Court of Appeals remanded the case to this Court for

---

[1] At last report, petitioner was incarcerated at Stateville Correctional Center. Marcus Hardy, the current warden at Stateville, is substituted as the respondent. *See* Rule 2(a), Rules Governing Section 2254 Cases.

consideration of the remaining issues in Richardson's petition.

Richardson has four remaining claims. First, he alleges that he was denied due process of law because his conviction was based on identification testimony that he contends was produced by suggestive procedures. Second, he contends that the prosecution systematically struck prospective black jurors in violation of his right to equal protection of the law, as set forth in *Batson v. Kentucky*, 476 U.S. 79 (1986), a case decided when Richardson's conviction and death sentence were on direct appeal. Third, Richardson alleges that he was denied due process by the prosecution's introduction of evidence of uncharged crimes. Fourth, Richardson contends he was denied effective assistance of counsel at the penalty phase of his case.

The Court previously ruled that Richardson was entitled to expansion of the record and an evidentiary hearing on his second claim, concerning the prosecution's use of its peremptory challenges against black jurors. *Richardson v. McCann*, 653 F. Supp. 2d 831 (N.D. Ill. 2008). The Court concluded the evidentiary hearing in May 2009. Post-hearing briefing was completed in June 2009. The Court acknowledges that it has had the matter under advisement for an inordinately long period since that date.

The Court deals with Richardson's non-*Batson* claims first and his *Batson* claim last.

## Facts

The Court takes the facts underlying Richardson's conviction from the Illinois Supreme Court's decision in his direct appeal. *People v. Richardson*, 123 Ill. 2d 322,

528 N.E.2d 612 (1988).

Shirley Bowden, a clerk at Twin Foods and Liquors, located on the south side of Chicago, testified that around 10:00 p.m. on the night of April 1, 1980, she was working at the store, which was empty except for employees and one customer. She saw a second man walk past her toward the liquor department, where Vrabel worked. She then heard a shot followed by a warning that "This is a stickup." Bowden and another employee, Bonnie Williams, testified that they saw the man run past them and out the store, though they ducked behind a counter when he approached. The police were called, and Vrabel was found on the floor, bleeding. He was pronounced dead on arrival at a local hospital.

Williams testified that in the summer of 1982, she selected Richardson's photo from a group of black-and-white photos the police showed her. Bowden was never called to view a lineup. At trial, both Williams and Bowden testified they had seen Richardson in the neighborhood before April 1, 1980, and both identified him as the shooter.

Ernest Warner, a firearms examiner, testified that in his opinion, bullets recovered from Vrabel's body and from a wall at Twin Foods bore the same class and individual characteristics as a bullet recovered from Thomas Fitzpatrick, who was shot in an armed robbery on April 5, 1980. Fitzpatrick testified that on that night, he was working at a tavern located about a mile from Twin Foods. A man entered, announced a stickup, and jumped over the bar, shooting Fitzpatrick when he tried to run. While Fitzpatrick was lying on his back, the man stood over him for about fifteen to twenty seconds and asked where the rest of the money was and then departed when

3

Fitzpatrick said there was no more money. Fitzpatrick testified that in May 1982, he tentatively identified Richardson from a set of photographs and then positively identified him after viewing a lineup. He testified in court that Richardson was his assailant. Ray Slagle, a customer in the tavern, also identified Richardson as the shooter. He testified that he had selected Richardson's picture from a set of photographs shown to him in September 1982 and that he had identified Richardson in a lineup held in October 1982.

James Sanders, a Chicago police sergeant, testified that on May 4, 1982, he received a radio broadcast of a robbery in progress at a location a little less than a mile from Twin Foods. He heard a description of the robber over his radio. He then observed a man in the vicinity of the crime scene matching the description and took him into custody. Sanders identified Richardson as the man he had taken into custody.

Joseph Dijiacomo, a Chicago police detective, testified about his preparation of two photographic arrays of man roughly fitting the description of the Twin Foods suspect, one set in black-and-white and one in color. John Solecki, also a Chicago police detective, testified that both Fitzpatrick and Slagle had identified a photo of Richardson from the set of black-and-white photos, but that both requested to see a lineup so they could be absolutely certain. Solecki also testified that both Fitzpatrick and Slagle positively identified Richardson in the lineup.

A police composite photo prepared from descriptions by witnesses to the Twin Foods shooting depicted the assailant with a full beard. Slagle, a witness to the tavern shooting, had described the shooter at the tavern as having a scraggly beard.

Richardson's mother, Arkonia Richardson, testified as a defense witness. She

4

stated that Richardson had never had a full beard, but only a moustache and a goatee.

## Discussion

**A.    Standard of review**

The Illinois Supreme Court decided three of Richardson's four remaining claims on their merits.  It concluded that the *Batson* claim was procedurally defaulted and thus did not address that claim on its merits.

A person convicted in state court may obtain a writ of habeas corpus on a claim that was adjudicated on its merits in state court only if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) & (2).

The "contrary to" standard of section 2254(d)(1) is met if, for example, "the state court applies a rule that contradicts the governing law set forth" by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The "unreasonable application" standard is met "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of petitioner's case," *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), or "unreasonably refuses to extend a principle to a context in which it should apply."  *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010) (internal quotation marks and citation omitted).  "[A]n *unreasonable* application of federal law is different

from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (emphasis in original). The state court must have applied federal law in an objectively unreasonable way. *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (quoting *Williams*, 529 U.S. at 411). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Finally, a decision involves an "unreasonable determination of the facts" if the petitioner rebuts the presumption of correctness that applies to state court fact-finding by clear and convincing evidence. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). This latter standard "is demanding but not insatiable. . . . [D]eference does not by definition preclude relief." *Id.* (internal quotation marks and citation omitted).

## B.    Other crimes evidence

As noted earlier, at Richardson's trial for the April 1, 1980 robbery and murder, the prosecution introduced evidence regarding an April 5, 1980 robbery and shooting of Thomas Fitzpatrick and a May 4, 1982 robbery. The trial judge ruled that the evidence of the April 5 robbery was admissible for the purpose of proving the identity of the April 1 offender and that the May 4 robbery was admissible to explain the circumstances of Richardson's arrest. Richardson contends that the admission of this evidence rendered his trial unfair by exposing him to the risk of conviction because he "was a generally bad person and, specifically, that he was a habitual armed robber," Pet.'s Reply at 51, in other words, based on propensity to commit crime.

6

On direct appeal, the Illinois Supreme Court acknowledged the dangers inherent in the admission of other-crimes evidence. *People v. Richardson*, 123 Ill. 2d 322, 338-39, 528 N.E.2d 612, 617 (1988) ("*Richardson I*"). The court concluded, however, that evidence regarding the April 5 shooting "was highly relevant and admissible." *Id.* at 339, 528 N.E.2d at 617. Specifically, the court stated that

> The evidence of the April 5, 1980, shooting clearly tended to identify defendant as the perpetrator of the April 1, 1980, murder, in light of the evidentiary links between the two crimes. Expert testimony at trial established that the same gun fired the bullet which killed Vrabel and the bullet which wounded Fitzpatrick. Further, the testimony defendant sought to exclude included eyewitnesses to the April 5 shooting identifying defendant as the gunman. Testimony that defendant was the man holding that particular weapon during a solo armed robbery on April 5 is clearly relevant to the determination of whether he was the man holding the weapon on April 1, when it was used to kill George Vrabel.

*Id.* at 339-40, 528 N.E.2d at 617. The court also rejected Richardson's contention that he was unfairly prejudiced by the level of detail presented regarding the April 5 shooting. *Id.* at 341-42, 528 N.E.2d at 618.

As for the May 4 robbery, the Illinois Supreme Court agreed with Richardson that there was "no justifiable basis for its admission." *Id.* at 342, 528 N.E.2d at 618. The court concluded, however, that the trial court's error was harmless. It stated that

> [t]he record before us confirms that the testimony relating to defendant's 1982 arrest, albeit irrelevant, disclosed only the fact that police had apprehended defendant as a person matching the description of a suspect sought in connection with an armed robbery. There was no "extensive discussion" of the collateral crime . . . . Further, . . . there was positive and credible identification evidence from several witnesses implicating defendant in the murder of George Vrabel.

*Id.* at 343-44, 528 N.E.2d at 619.

Because the Illinois Supreme Court dealt with the claim on its merits, Richardson

is entitled to relief only if that court's decision was contrary to United States Supreme

Court precedent or unreasonably applied it (Richardson does not argue that the state

supreme court's decision involved an unreasonable application of the facts in light of

the evidence presented).

The state court's decision was not contrary to United States Supreme Court

precedent. No Supreme Court case holds that admission of other-crimes evidence, as

such, violates the constitutional rights of an accused person even if it is admitted to

show the propensity of the accused to commit crimes. Indeed, the Supreme Court has

expressly reserved judgment on this question. *See Estelle v. McGuire*, 502 U.S. 62, 75

n. 5, (1991) ("Because we need not reach the issue, we express no opinion on whether

a state law would violate the Due Process Clause if it permitted the use of 'prior crimes'

evidence to show propensity to commit a charged crime.").

In *Michelson v. United States*, 335 U.S. 469 (1948), the Supreme Court, in

discussing "[c]ourts that follow the common-law tradition," stated that such courts

"almost unanimously have come to disallow resort by the prosecution to any kind of

evidence of a defendant's evil character to establish a probability of his guilt." *Id.* at

475. But this involved a description of the law of evidence, not a federal constitutional

principle. *See, e.g., United States v. Rogers*, 587 F.3d 816, 821 (7th Cir. 2009) (citing

*Michelson* for the proposition that "common-law courts traditionally considered the

propensity inference relevant but improper" and noting that "[Federal] Rule [of

Evidence] 404(b) explicitly adopts this common-law tradition."). *See also Bennett v.

Bartley*, No. 07 C 1975, 2008 WL 4866169, at *4 (N.D. Ill. June 23, 2008) (recognizing

that "the Supreme Court has not established a clear precedent regarding" the due process implications of "permitting the use of past crimes evidence to show propensity"); *United States ex rel. Brady v. Hardy*, No. 10 C 2098, 2011 WL 291058, at *12-13 (N.D. Ill. Jan. 27, 2011).

As a result, the only federal constitutional principle on which Richardson may rely "is a catch-all sense of due process, [a claim that] almost always fails." *See Hammer v. Karlen*, 342 F.3d 807, 811 n. 3 (7th Cir. 2003) (internal quotation marks and citation omitted). As a matter of due process, a state court evidentiary rulings are a basis for federal habeas corpus relief only if the rulings "'so infused the trial with unfairness as to deny due process of law.'" *Estelle v. McGuire*, 502 U.S. 75 (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)).

Though the Illinois Supreme Court did not apply this standard in so many words, its conclusion that the evidence of the April 5 shooting was highly relevant and that the level of detail was not unfairly prejudicial amounts to a finding that its admission was not unfair. The same is true of its conclusion that the admission of the evidence about the May 4 robbery did not result in "justice [being] denied" and that it was "unlikely to have contaminated the jury." *Richardson I*, 123 Ill. 2d at 343-44, 528 N.E.2d at 619. Neither of these conclusions amounted to an unreasonable application of federal due process / fair trial requirements. A state court decision that does not cite federal precedent is nonetheless consistent with U.S. Supreme Court decisional law "so long as neither the reasoning nor the result of the state-court decision" contradicts" the Supreme Court's decisions. *Early v. Packer*, 537 U.S. 3, 8 (2002).

Reasonable jurists could agree that admission of the evidence regarding the April 5 shooting and the very limited evidence about the May 4 robbery did not expose Richardson to an unfair risk that his guilt would be determined based on inappropriate or irrelevant factors. In particular, reasonable jurists could conclude that the evidence about the April 5 shooting was highly relevant on the question of Richardson's identity as the shooter of George Vrabel. This was so given the testimony that the bullets recovered from the two crime scenes shared general and specific characteristics, indicating that the same gun was used in both shootings,[2] and the fact that Slagle and Fitzpatrick both positively identified Richardson as the shooter in the April 5 incident. The testimony about the May 4 robbery was irrelevant, as the Illinois Supreme Court concluded, but reasonable jurists could conclude that the brief evidence about the radio call and the apprehension of Richardson did not unfairly prejudice him. In addition, as the Illinois Supreme Court noted, the jury was instructed that it could consider the evidence on these other crimes solely "on the issues of defendant's identification and the manner in which he came to police attention in the case." *Richardson*, 123 Ill. 2d at 344, 528 N.E.2d at 619. Given these factors, the state court's conclusion that the admission of this evidence did not deny Richardson due process did not amount to unreasonable application of federal constitutional standards.

## C.    Identification testimony

Richardson argued on direct appeal, and he contends in his habeas corpus

_____

[2] The Illinois Supreme Court concluded that Richardson had forfeited any objection to the foundation for the expert's testimony because he had not objected to it at trial. *Richardson*, 123 Ill. 2d at 340, 528 N.E.2d at 617-18.

petition, that the police used unduly suggestive procedures to obtain identifications of him from eyewitnesses to the April 1 and April 5 shootings and that this rendered his trial unfair. Specifically, he argues that three of the four witnesses who identified him "were exposed to multiple pre-trial identification procedures which made it obvious that the suspicions of the police had fallen upon" Richardson. Pet.'s Suppl. Mem. at 3.

The evidence showed that there were three pretrial identification procedures: an initial photographic lineup involving black-and-white photos; a second photographic lineup involving color photos; and a third in-person lineup. Richardson was the only person whose face appeared in all three. Two witnesses at trial participated in all three of these procedures: Thomas Fitzpatrick, the victim of the April 5 armed robbery, and Bonnie Williams, a clerk at Twin Foods. Another witness, Ray Slagle (a witness to the April 5 robbery), participated in two of them.

The Illinois Supreme Court considered on the merits Richardson's claim that this violated due process. The court correctly identified the federal constitutional standard:

> The determination as to whether a pretrial confrontation in a specific instance is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process . . . depends on the totality of the circumstances surrounding it." (*Stovall v. Denno* (1967), 388 U.S. 293, 302, 87 S. Ct. 1967, 1972, 18 L. Ed.2d 1199, 1206.)

*Richardson*, 123 Ill. 2d at 348, 528 N.E.2d at 621.

Richardson concedes that the state court considered the proper U.S. Supreme Court authority. He argues, however, that it applied that authority unreasonably.

The fact that witnesses saw a photograph of Richardson (but not of anyone else in the lineup) before seeing him in a lineup certainly provided a potential for suggestion,

or even a false identification. The Illinois Supreme Court, however, assessed the reliability of the identification testimony in a reasonable and thorough way, and it considered the necessary factors.

With regard to Fitzpatrick, the Illinois Supreme Court found that he "had an excellent opportunity to view his assailant, focusing his attention as defendant entered the bar waving the gun, as he jumped over the counter, and as he stood over Fitzpatrick in the well-lit hallway." *Richardson*, 123 Ill. 2d at 351, 528 N.E.2d at 623. It also noted that Fitzpatrick's identification of Richardson from the photo array "was tentative" and that "he wanted to see a lineup to be sure." *Id.*

As to Slagle, the Illinois Supreme Court found that he had viewed the gunman "for several minutes as [he] entered the bar, as he rifled the cash registers, and as he ran through the bar to make his escape," that Slagle's attention "was clearly focused on the gunman," and that he had given "a detailed description of the assailant and [had] identified defendant from the photographic arrays." *Id.*

Finally, with regard to Williams, the Illinois Supreme Court noted that the evidence reflected that she "observed the gunman when he was removing money from the victim's cash register" and again as he ran toward her while heading for the door, and that "[a]ll of her attention remained focused on the robbery and the robber," who "made no attempt to conceal his features." The court also noted that "Williams was able to give police a detailed description of [the offender]" and "was further able to positively identify defendant from the first array of photos, although two years had passed since the murder." *Id.* at 351, 528 N.E.2d at 622-23.

Though one could dispute the Illinois Supreme Court's conclusions, they did not

amount to objectively unreasonable application of due process standards. The court appropriately focused on the reliability of the identification testimony. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). In addition, the state court considered, as required, the factors identified by the Supreme Court to assess reliability:

> The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* Though reasonable jurists could disagree regarding the amount of weight to give to each of these factors, the Illinois Supreme Court's application of the due process standard does not approach the requirement of objective unreasonableness.

## D.     Ineffective assistance claim

Richardson's ineffective assistance claim concerns the penalty (sentencing) phase of his case, which was conducted before the trial judge without a jury.

The prosecution submitted extensive evidence in aggravation. Most of it involved Richardson's prior arrests and convictions.

-       Richardson was arrested in 1971 for theft and in 1972 for battery. Both charges were dismissed.

-       Richardson was dishonorably discharged from the U.S. Marine Corps, in which he served from 1972 through 1975, after years of trouble with the military police. When he testified on his own behalf at the penalty phase, Richardson admitted having been AWOL for the majority of the time he served in the miliary.

13

- In 1975, he was arrested for setting a car on fire and being involved in a fight near the car. He failed to appear in court, and an arrest warrant was issued. The disposition of the charges was unknown.

- In 1976, Richardson was arrested for disorderly conduct at a bar, but no charges were filed.

- In 1977, Richardson and his brother were arrested and charged with robbery in connection with an incident in which they were alleged to have hit one of the victims and thrown him through a plate glass window. The disposition of the charges was unknown.

- Later in 1977, Richardson was arrested and charged with robbing a man of money and a watch. He pled guilty and was sentenced to a prison term.

- In 1988, within a short time after he was released on parole, Richardson stole a van and was convicted of felony theft. He was sentenced to a prison term.

- In 1979, two weeks after being released from prison, Richardson was arrested for disorderly conduct in connection with an alleged altercation with police, but no charges were filed.

- On April 1, 1980, Richardson committed the murder / robbery for which he was tried.

- On April 5, 1980, he committed the tavern robbery / shooting that was introduced in evidence at the murder trial.

- In September 1980, Richardson was arrested for allegedly assaulting a witness outside the criminal courthouse, but the charge was later dismissed.

-       In January 1981, he was charged with possession of a controlled
substance and was sentenced to a prison term.

-       In February 1981, while on parole, Chicago police officers went to
Richardson's apartment to serve him with a warrant.  The officers knocked and
waited but entered the apartment when they heard a window opening.  They saw
Richardson holding a bag with the butt of a gun sticking out the opening.  It was
a loaded sawed-off shotgun.  He was convicted of weapons possession and
sentenced to a prison term.

-       In May 1982, four months after his release from prison, Richardson was
arrested for armed robbery.  The victim testified that he approached her with a
gun, which he placed against her side, and demanded the money and valuables
of her and her companions.  She claimed he threatened to kill her, struck her in
the face, and tore her shirt.  The victim called the police, who located Richardson
and arrested him.  The victim's watch and money were in his possession.

-       In December 1983, while in the Cook County Jail awaiting trial, a
correctional officer searched Richardson's cell and found homemade liquor and
gang literature.  When a sergeant confronted Richardson about this, he struck
the sergeant and head-butted another officer.  Several officers were needed to
subdue him.

*See Richardson II*, 189 Ill. 2d at 417-19, 727 N.E.2d at 372-73.

Richardson's trial counsel introduced the testimony of Richardson, his mother,
and Victoria Smith, his common law wife.  Smith testified that she had known
Richardson for ten years and that he had fathered two children with her, both born after

he had been sent to prison for earlier crimes. She said that she and the children had maintained contact with Richardson, he treated them well, and their son looked up to him. She also testified about jobs Richardson had held when not in prison, saying he had tried to support her and their children. She described him as a good person who had tried to make life better for them and wanted to accomplish something in his own life.

Richardson's mother, Arcania Richardson, described his childhood and family life, including jobs he had held. She described him as a father figure who had looked after her and his siblings. She testified that he returned home in 1975 after being discharged from military service and again in 1978 when he was paroled after serving time for robbery. She said that she had tried to do her best for Richardson but that he had been unable to find work after serving time in prison. She testified that he had maintained a close relationship with the family.

Richardson testified that after his father died, he quit school to work and help support the family. He described various jobs he had held and the fact that he had obtained a GED. Richardson denied any involvement in the Twin Foods robbery and the murder of George Vrabel. He admitted having committed the other crimes for which he had been convicted. He denied ownership of the sawed-off shotgun found at the apartment where he had been living with Smith and their son. Richardson stated that he had joined a street gang while in prison to obtain protection, but he denied taking part in any gang activity or holding any rank in the gang. He admitted that he had recruitment material from the gang in his prison cell but denied telling others to read it. He said that he had maintained a close relationship with his mother, Smith, and their

sons.

Richardson contends that his attorneys should have introduced evidence as

follows:

- He was born prematurely and weighed only five pounds at birth and

suffered chronic fevers as an infant, one of which was nearly fatal.

- He was often beaten by gang members while protecting his sister on their

way to school. He had been beaten unconscious and suffered multiple head

traumas, which suggest he had brain damage.

- He was at the bottom of the low-average range of intelligence and slightly

above the borderline of mental deficiency, and his attention and reasoning skills

were at a similar level.

- He read at a sixth grade level and had mathematical skills at a sixth grade

level.

- He had difficulties with impulsivity and suffered from poor reasoning,

problem solving, judgment, and inhibition control.

Richardson first asserted his claim of ineffective assistance at the post-conviction

stage of the state court proceedings. At that point, he was still under a sentence of

death. He supported the claim with reports from a neurologist and a mitigation expert

who had conducted interviews and reviewed records. He argued that all of this

information had been available but that his trial counsel had done no investigation

regarding his background aside from the efforts they conducted that led to calling

Richardson himself, his mother, and his common law wife. He introduced an affidavit

from one of his trial lawyers, Joseph McElligott, who stated that he did not recall any

preparation for the sentencing proceeding other than interviewing Richardson, his mother, and Smith.

In addressing Richardson's claim, the Illinois Supreme Court acknowledged and cited the federal standard for ineffective assistance of counsel. *See Richardson II*, 189 Ill. 2d at 410-11, 727 N.E.2d at 369 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). The court also acknowledged that counsel had an obligation to investigate potential sources of mitigation evidence or to have a reason not to make such an investigation, and to introduce mitigation evidence at sentencing. *Id.* at 413-14, 727 N.E.2d at 370.

The Illinois Supreme Court held, however, that "counsel's performance at the death sentencing hearing was clearly a strategic decision. In his opening statement, defendant's trial counsel informed the court that defendant would testify that he was not guilty of the crimes charged. During closing argument, defendant's trial counsel emphasized defendant's relationship with his family . . . ." *Id.* at 414, 727 N.E.2d at 370-71. The court reviewed the evidence of psychological impairments offered by post-conviction counsel and concluded that given Richardson's testimony that he had not committed the murder, "it would have been contradictory for his trial counsel to present mitigation evidence to explain or clarify why defendant committed the murder. Defense counsel could not be expected to present mitigation evidence that contradicted defendant's protestations of innocence." *Id.* at 416, 727 N.E.2d at 372 (citations omitted).

The court also concluded, in the alternative, that even had trial counsel introduced this evidence, there was no reasonable possibility that the trial judge would

have concluded that the balance of aggravating and mitigating circumstances did not warrant a death sentence. *Id.* In this regard, the court noted that the aggravation evidence was "extensive," consisting of evidence of an extensive history of other crimes, some of them violent. *Id.* at 416-18, 727 N.E.2d at 372-73. The aggravation evidence also included testimony about an incident while Richardson was incarcerated pending trial in which gang literature and homemade liquor were found in his cell and, after being confronted by a correctional officer, he struck the officer and head-butted another officer. *Id.* at 419, 727 N.E.2d at 373. The court stated that the evidence of alleged mental impairments was "not inherently mitigating" because it "could have demonstrated defendant's continued dangerousness," *id.* at 420, 727 N.E.2d at 374 (internal quotation marks and citation omitted). It found there was no reasonable possibility that this evidence would have led the trial judge to impose a sentence other than death. *Id.*

The Supreme Court next considered the evidence, not discovered or offered by trial counsel, regarding Richardson's social history. It reviewed the evidence and similarly found that the trial judge could have considered it to be an aggravating factor: "The judge could have regarded defendant's troubled life, with his criminal record, as an indicator of future dangerousness. Specifically, the trial judge could have considered a history of substance abuse as an aggravating circumstance rather than a mitigating circumstance." *Id.* at 421, 727 N.E.2d at 374 (citations omitted). The court concluded that the introduction of his evidence "would not have created a reasonable possibility of a different sentence." *Id.*

Richardson no longer faces a death sentence. That does not, however, render his claim moot. He notes that the trial judge was not required to impose a sentence of life without parole if he had not imposed a death sentence. He contends that it is reasonably possible that the absent evidence, had it been introduced by trial counsel, would have led the judge to impose a term of years that would have enabled his eventual release from prison. *See* Pet.'s Suppl. Mem. at 70; *see generally Simpson v. Battaglia*, 458 F.3d 585, 595 (7th Cir. 2006).

The Illinois Supreme Court's determination that trial counsel's failure to offer psychological-impairment evidence was a reasonable strategic decision is subject to serious question. Though the court acknowledged that strategic decisions are largely unchallengeable if "made after investigating the law and the facts," *Richardson II*, 189 Ill. 2d at 413, 727 N.E.2d at 370, it does not appear to have applied that principle at all, let alone reasonably. The Sixth Amendment standard, as established by the U.S. Supreme Court in *Strickland*, requires deference to counsel's strategic decisions only if they are made after investigation or a reasonable decision that investigation is unnecessary:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

In Richardson's case, the undisputed evidence was that trial counsel conducted *no* investigation into whether there was viable mitigating evidence. As *Strickland* makes clear, no investigation amounts to objectively reasonable conduct only if counsel made "a reasonable decision that . . . . particular investigation[ ] [was] unnecessary." *Id.* at 691. The Illinois Supreme Court, however, completely disregarded that essential element of the *Strickland* analysis. Its decision in that regard was contrary to *Strickland*, or at a minimum it was an unreasonably unreasonable application of *Strickland*. Because trial counsel appear to have had no clue about the existence of other mitigating evidence, they were in no position to make a reasonable strategic decision whether to advise Richardson to continue to maintain his innocence at the penalty phase or instead to rely on evidence of diminished capacity and other mitigating social factors.

Richardson cannot prevail on this claim, however, unless he also establishes that the Illinois Supreme Court's decision that he was not prejudiced within the meaning of *Strickland* was objectively unreasonable. That is where Richardson's claim fails. Were the Court considering the matter afresh, it might well disagree with the state court's assessment of the prejudice issue. But that is not the standard of review. This Court may grant Richardson relief only if it is not possible that fairminded jurists could disagree about whether the state court unreasonably applied *Strickland* and its Supreme Court progeny on the issue of prejudice. *Harrington*, 131 S. Ct. at 786.

Though the matter is not free from doubt, the Court concludes that the state court did not unreasonably apply *Strickland* on the prejudice issue. The Court believes

that reasonable jurists could agree with the Illinois Supreme Court's assessment that it was at least equally likely that the sentencing judge would have taken the proposed mitigating evidence as showing that Richardson would present a serious danger to the community if he were one day released. This is particularly so when considered in light of Richardson's criminal history, which reasonably could be understood as showing a continuing escalation of violent criminal conduct. In sum, the Court cannot say that the state court unreasonably applied *Strickland* when it concluded there was no reasonable possibility that the sentencing judge would have imposed any sentence other than one that would have prevented Richardson's eventual release – either a death sentence or a sentence of life without parole. For this reason, the Court rejects Richardson's ineffective assistance claim.

**E.    Batson claim**

    **1.    Procedural default / cause and prejudice**

As indicated earlier, on appeal from the denial of Richardson's post-conviction petition, the Illinois Supreme Court rejected his *Batson* claim on the ground that he had forfeited it by failing to object at trial to the prosecution's peremptory challenges. *People v. Richardson*, 189 Ill. 2d 401, 409-10, 727 N.E.2d 362, 368 (2000) ("*Richardson II*").[3]

_____

[3] The Illinois Supreme Court did not hold the *Batson* claim defaulted because Richardson had failed to argue it on direct appeal; its ruling was that Richardson had defaulted the claim at the trial level. Respondent appears to contend that Richardson's failure to assert the claim on direct appeal is a separate procedural default that precludes consideration of the *Batson* claim on the merits. If so, Richardson has established cause for the default. The existence of cause is a matter of federal law. *See, e.g., Murray v. Carrier*, 477 U.S. 478, 489 (1986). In view of the fact that

(continued...)

This Court previously concluded that Richardson had established cause for the procedural default of his *Batson* claim, in that the claim was not reasonably available under the law when the Illinois Supreme Court held he had defaulted it, i.e., at the time of his trial. *Richardson v. McCann*, 653 F. Supp. 2d at 842-46. The shorthand version of the Court's rationale is that under U.S. Supreme Court precedent, a claim is considered not to be reasonably available if the Supreme Court decision that later established it expressly overruled one of that Court's precedents. *See id.* This was the case with *Batson*, which expressly overruled *Swain v. Alabama*, 380 U.S. 202 (1965), the controlling Supreme Court precedent at the time of Richardson's trial regarding a prosecutor's discriminatory use of peremptory challenges against black jurors.

This Court also concluded, in the alternative, that even if Richardson's *Batson* claim was deemed to be reasonably available at the time of his trial, he still might be able to establish cause for the default, consisting of ineffective assistance of counsel for failing to challenge the prosecution's peremptory strikes. *Richardson v.*

_____

[3](...continued)
*Batson* was decided while Richardson's direct appeal was pending, his appellate counsel's failure to assert the issue on appeal – as a substantive *Batson* claim or at least as a claim of ineffective assistance of trial counsel for failure to object at trial – unquestionably fell below a standard of objective reasonableness and prejudiced Richardson, in that counsel bypassed a claim strongly supported by the record that would have entitled him to a new trial if sustained. As this Court has previously discussed, the state supreme court rejected, in *Richardson II*, Richardson's claim of ineffective assistance of appellate counsel. It stated that it was not ineffective assistance for appellate counsel not to assert an argument that had been forfeited at trial. To the extent that this ruling carries any weight in the analysis of "cause" under federal law, it amounted to an unreasonable application of U.S. Supreme Court precedent. That precedent did not recognize a *Batson*-type claim at the time of trial, thus giving Richardson a viable basis to excuse the claimed forfeiture. *See Richardson v. McCann*, 653 F. Supp. 2d at 842-46.

*McCann*, 653 F. Supp. 2d at 846-49.[4]  The Court deferred making a definitive ruling on this point until after an evidentiary hearing.  *Id.* at 849.

A habeas corpus petitioner who procedurally defaulted a claim in state court must show not only cause for the default but also that he was prejudiced as a result.  This, as the Court noted in its previous decision, requires Richardson to show that the errors at trial "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Murray*, 477 U.S. at 494 (emphasis in original; internal quotation marks and citation omitted).  *See Richardson v. McCann*, 653 F. Supp. 2d at 849.  On the prejudice issue, this Court stated as follows:

> If, as Richardson contends, the prosecution violated his equal protection rights by striking jurors because of their race, than there is no question his trial was infected with error of constitutional dimensions.  This inquiry, however, is intertwined with the ultimate merits of Richardson's *Batson* claim, which in turn may depend on the further development of the record.  As a result, the Court cannot determine at this stage whether Richardson has satisfied the test for prejudice.  That determination will have to await the hearing on the *Batson* issue that the Court orders in this decision.

*Id.* at 849-50.

The evidence that Richardson and respondent offered in connection with the evidentiary hearing addressed the merits of the *Batson* claim, the intertwined determination of the "prejudice" issue, and the ineffective assistance of trial counsel issue.  The evidence primarily concerned information regarding the race of certain prospective and excluded jurors; statements by the trial prosecutors; and evidence on the ineffective assistance point.

---

[4] In this regard, the Court ruled that Richardson had not defaulted a claim of ineffective assistance as cause for the procedural default of the *Batson* claim. *Richardson v. McCann*, 653 F. Supp. 2d at 847.

## 2.    Facts relating to the jury selection process

Jury selection for Richardson's trial was held on March 26-27, 1984.  Ninety-one prospective jurors appeared in court.  Of these, forty-six were white and forty-three were black.  The race of two of the prospective jurors is unknown,[5] but that is not terribly significant because neither of them ended up being tendered to counsel for possible selection.

Each of the prospective jurors had filled out a brief written questionnaire (called a juror card) before coming to court.  The trial judge and the attorneys had access to the juror cards during the voir dire.

The trial judge conducted the oral voir dire himself; counsel did not put questions to the prospective jurors.  The jury was selected in panels of four.  In other words, the judge questioned enough prospective jurors judge until four were qualified.  The panel of four jurors was then tendered to the prosecution for peremptory challenges.  After the prosecution struck whatever jurors it wished to strike from the panel, additional jurors were qualified and tendered to the prosecution for peremptory challenges.  This process continued until there was a panel of four that was acceptable to the prosecution.  The resulting panel was then tendered to the defense for peremptory challenges, and more jurors were filled in as the defense struck jurors.  Once this resulted in a panel acceptable to the defense, the panel was then re-tendered to the

---

[5] Specifically, Cora Dixon and Flora Pruitt.  Ms. Dixon was never questioned by the trial judge.  Ms. Pruitt stated near the outset of the voir dire that she had a doctor's appointment the following week.  The record does not specifically reflect, however, that the trial judge excused her.  Either way, however, neither of these jurors was tendered to counsel for possible selection.

prosecution, which could then exercise peremptory challenges against jurors that had been added following its acceptance of the initial panel. This process continued, back and forth, until there was a panel of four jurors accepted by both sides. Those jurors were then sworn in, and the process resumed with the selection of another panel.

The record discloses that trial judge excused for cause twenty-six members of the venire, thirteen of them white and thirteen of them black.[6] This left sixty-five potential jurors. Of these, thirty-three were white, thirty were black, and the race of two of them is unknown. If the race of the unknown jurors is disregarded, the composition of the venire, not counting those excused for cause, was fifty-two percent white (33/63) and forty-eight percent black (30/63).

During voir dire, fifty jurors were tendered to one side or the other after being questioned. Of these, fifty-four percent were white (27/50), and forty-six percent were black (23/50).

More significant for present purposes, however, is the racial composition of the group of jurors tendered to the prosecution for selection. There were forty-one such jurors. Of these, forty-four percent were white (18/41), and fifty-six percent were black (23/41).

Even though the jurors tendered to the prosecution were predominantly black, the jury that ultimately decided Richardson's case was only one-third black (4/12) and was two-thirds white (8/12). This occurred due to the prosecution's disproportionate use of its peremptory challenges against black jurors. Indeed, the prosecution excused

---

[6] For this purpose, the Court assumes that prospective juror Flora Pruitt was not excused for cause. *See* n.5 *supra*.

only black jurors.  It did not excuse a single white juror.

Each side had twenty peremptory challenges.  The prosecution used sixteen of its challenges.  It used all sixteen to strike black jurors.  The jury that was selected included eight whites and four blacks.  There were two alternates, one white and one black.  During the course of the trial, the black alternate replaced a black juror who was excused.  As noted above, if one considers only the twelve originally selected jurors, the jury was sixty-seven percent white (8/12) and thirty-three percent black (4/12).  If one includes the alternates, the jury, including alternates, was sixty-four percent white (9/14) and thirty-six percent black (5/14).

On the first day of jury selection, there were forty-nine prospective jurors in the courtroom.  After excusing a number of jurors for cause, the trial judge discharged a number of jurors for that day, directing them to return the next day.  At this point, twenty-one jurors remained in the courtroom.  One of these, a black prospective juror, was excused for cause by the trial judge a bit later in the day.  This left twenty jurors, eleven of whom were black (fifty-five percent), and nine of whom were white (forty-five percent).  By the end of the first day of jury selection, three of these eleven black prospective jurors had been seated, the prosecution had struck seven, and the defense had struck one.

As indicated earlier, the trial judge selected the jury in panels of four.  The first panel the judge tendered to the parties included prospective jurors Moses (black), Sanders (black), Edwards (black), and Scaman (white).  Both the prosecution and defense accepted all four, and they were sworn in.

The selection of the second panel took a good deal longer.  The judge tendered

27

prospective jurors Allen (black), Overton (black), Bogs (white), and Ladd (white) to the prosecution. The prosecution struck the two black jurors, Allen and Overton, leaving two white jurors. The judge then tendered two more black jurors, Dixon (black) and Price (black). The prosecution struck both of them. The judge tendered two more black jurors, Benton (black) and Purnell (black). The prosecution struck one of them, Benton, leaving the second black juror, Purnell, on the panel. The judge tendered prospective juror Mack (white), and the prosecution accepted her.

The resulting panel that the judge tendered to the defense included prospective jurors Bogs (white), Ladd (white), Benton (black), and Mack (white). The defense excused Ladd (white), Benton (black), and Mack (white). The judge tendered three more jurors, Nietfeldt (white), Wilson (black), and Ciszewski (white). The defense excused the two newly-added white jurors, Nietfeldt and Ciszewski. The judge tendered two jurors to replace them, Colyer (black) and Szymanski (white). The defense excused Szymanski (white). The judge tendered juror Kale (white) to the defense, and the defense excused him. At this point, the judge adjourned for the day.

The selection of the second panel of four jurors continued on March 27. The judge tendered juror Gilmore (black) to the defense, which accepted him. At this point, the panel consisted of three black jurors and one white juror: Bogs (white), Wilson (black), Colyer (black), and Gilmore (black). The prosecution excused two of the black jurors, Colyer and Wilson. The judge tendered two new jurors, Smith (black) and Zawislak (white). The prosecution excused the black juror, Smith. In her place, the judge tendered juror Mandoky (white). The prosecution accepted him.

This left a panel that consisted of one black juror and three white jurors, Bogs

(white), Gilmore (black), Zawislak (white), and Mandoky (white).  The defense excused

two white jurors, Zawislak and Mandoky.  The judge tendered jurors Dixon (black) and

Drenth (white), and the defense excused Drenth (white).  In her place, the judge

tendered juror Delegato (white), and the defense accepted her.

The resulting panel tendered to the prosecution consisted of two black jurors and

two white jurors:  Bogs (white), Gilmore (black), Dixon (black), and Delegato (white).

The prosecution excused Dixon, a black juror, and juror Chilla (white) was tendered to

replace her.  The prosecution and defense both accepted the resulting panel, which

consisted of three white jurors and one black juror:  Bogs (white), Gilmore (black),

Delegato (white), and Chilla (white).  The trial judge swore them in.  At this point, there

were four white jurors and four black jurors.

The third panel initially tendered to the prosecution included three white and one

black juror:  Silhavy (white), Hozian (white), Blatse (white), and Wolfe (black).  The

prosecution excused the black juror, Wolfe.  A white juror, Berlin, was tendered in her

place, and the prosecution accepted her and the panel, leaving an all-white panel to

tender to the defense.  The defense excused three of the white jurors, Silhavy, Hozian,

and Blatse, and they were replaced with jurors Gudas (white), McGee (black), and Lisak

(white).  The defense excused Gudas and Lisak, both of whom were white.

After a break, forty-two additional prospective jurors came to the courtroom.

After questioning them, the judge excused thirteen, leaving twenty-nine jurors.

Fourteen were black, thirteen were white, and the race of two was unknown.

Even though the remaining prospective jurors were almost equally distributed

racially, the last four regular jurors selected and sworn were all white.  This occurred

29

largely because the prosecution excused five black jurors.  It accepted a sixth black juror, but the defense excused that juror.

After the break, the last panel started out with two jurors, Berlin (white) and McGee (black).  The judge tendered two additional jurors, Kilkus (white) and Korda (white).  The defense excused Korda (white), and he was replaced with juror Tucker (black), whom the defense accepted.

A panel that included two white jurors, Berlin and Kilkus, and two black jurors, McGee and Tucker, was tendered to the prosecution.  The prosecution excused both black jurors, McGee and Tucker.  They were replaced with two white jurors, Brandstedt and Curran.  The prosecution accepted the resulting all-white panel.  The defense excused Brandstedt (white); the judge tendered juror Malito (white); and he was replaced with juror Redmond (black), whom the defense accepted.  The prosecution excused Redmond, and he was replaced with Szeszycki (white), whom the prosecution accepted.  The defense excused Szeszycki (white), and he was replaced with juror Upshire (black).  The defense accepted Upshire.  The prosecution excused Upshire, and he was replaced with juror Hopkins (black), whom the prosecution accepted, but the defense struck.  He was replaced with juror Tolbert (black), whom the defense accepted, but the prosecution struck.  Tolbert was replaced with juror McKee (white), whom the prosecution and the defense both accepted.  The resulting panel of four jurors, all white, was sworn in.

The alternate jurors were selected as follows.  The judge tendered juror McDonald (black) to the prosecution, who excused him.  He was replaced with juror Gunn (black), whom both the prosecution and defense accepted.  The next juror

tendered was Orozco (white), whom both sides accepted. The alternates were then sworn in.

It is arguably noteworthy that of the next four jurors that would have been tendered, the first, juror Ude, was white, and the other three, Glenn, Ramsey, and Williams, were black. Thus, as Richardson notes, if the prosecution had used more of its strikes earlier in the process, three more black jurors would have been tendered, and in that scenario the prosecution likely would not have had enough strikes left to exclude all of them.

As the Court has indicated, the prosecution used sixteen of its twenty peremptory challenges. It used all sixteen of them (one hundred percent) to excuse black jurors. Including alternates, all told, the jurors tendered to the prosecution included eighteen white jurors (forty-four percent) and twenty-three black jurors (fifty-six percent). The prosecution accepted one hundred percent of the white jurors tendered (eighteen of eighteen) but only thirty percent of the black jurors (seven of twenty-three).

This is not a case in which the prosecution struck all of the black prospective jurors. Indeed, it could not have done so given the number of black prospective jurors in the venire. Richardson's theory is that the prosecution essentially adopted a quota – it was willing to accept a few black jurors but wanted to avoid a majority-black jury.

### 3. The evidentiary hearing and expansion of the record

The Court previously concluded that it was appropriate to conduct an evidentiary hearing and expand the record on Richardson's *Batson* claim. *See Richardson*, 653 F. Supp. 2d at 853-54. The Court made clear that the evidentiary hearing would involve both the prejudice element of the cause-and-prejudice analysis and the merits of the

*Batson* claim itself.  *See id.* at 850, 853-54.  The Court now revisits the latter of these determinations in light of the Supreme Court's recent decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).

In *Pinholster*, a federal habeas corpus petitioner claimed that his trial counsel had rendered ineffective assistance at the penalty phase of the trial.  The state supreme court twice rejected the claim on the merits.  *See id.* at 1396-97.  On habeas review, the federal trial court granted an evidentiary hearing and allowed supplementation of the factual record.  The court then granted a writ of habeas corpus on ineffective assistance grounds.  *Id.* at 1397.  The court of appeals affirmed, taking into consideration the additional evidence adduced at the federal hearing.  *Id.*

The Supreme Court reversed.  It started with 28 U.S.C. § 2254(d), which provides (as noted earlier) that if a claim has been adjudicated on the merits in state court, a federal court may not grant a writ of habeas corpus based on that claim unless the state court's decision was contrary to or unreasonably applied clearly established federal law.  *Id.* at 1398 (citing 28 U.S.C. § 2254(d)(1)).  The Court concluded that the "backward-looking language" of section 2254(d)(1) "requires an examination of the state-court decision at the time it was made" and that "[i]t follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court."  *Id.*  The Court ruled that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id.* at 1400.

The Court went on to address the petitioner's contention that its holding

rendered superfluous the provision of the federal habeas corpus statute that concerns when a court can conduct an evidentiary hearing in a habeas corpus proceeding, 28 U.S.C. § 2254(e)(2). The Court said that section 2254(e)(2) "continues to have force where § 2254(d)(1) does not bar federal habeas relief. . . . [N]ot all federal habeas claims by state prisoners fall within the scope of § 2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings.'" *Id.* at 1401. Section 2254(e)(2), the Court concluded, still applies when the federal court is "deciding claims that were not adjudicated on the merits in state court." *Id.*

Richardson's *Batson* claim was not "adjudicated on the merits in state court." Rather, the Illinois Supreme Court held that the claim was forfeited (waived, as that court put it). *Richardson II*, 189 Ill. 2d at 409-10, 727 N.E.2d at 368. Thus it did not address or decide the claim on the merits.

Before the state supreme court's ruling, the state *trial* court had determined Richardson's *Batson* claim on the merits. This, however, is beside the point, given the state supreme court's determination that the claim had been forfeited. To qualify as an adjudication on the merits, "the state court's resolution of the claim must have preclusive effect." *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The Illinois Supreme Court decided Richardson's *Batson* claim on purely procedural, not substantive grounds. As in *Thomas v. Horn*, that decision "stripped the [trial] court's substantive determination of [petitioner's] claims of preclusive effect." *Id.*

The fact that a lower state court decided the claim on the merits is of no consequence for purposes of determining whether the claim was decided on the merits

or, alternatively, on procedural grounds.[7]  As Judge Easterbrook stated for the Seventh

Circuit in *Liegakos v. Cooke*, 103 F.3d 1381 (7th Cir. 1997), "the disposition of the last

state court to issue an opinion determines whether the state has invoked a ground of

forfeiture."  *Id.* at 1385.  Here the last state court opinion quite definitively "involved a

ground of forfeiture."  Given the Illinois Supreme Court's ruling, Richardson's

*Batson* claim cannot be said to have been determined on the merits in state court for

purposes of section 2254(d)(1) or section 2254(e)(2), even though a lower court did

decide the claim on its merits.  Thus *Cullen v. Pinholster* did not affect this Court's

authority to conduct an evidentiary hearing.

The Court therefore reaffirms, in full, its decision to hold an evidentiary hearing

and expand the record with regard to Richardson's *Batson* claim.

**4.      The ineffective assistance issue**

The only additional evidence before the Court on the "cause"-related issue of

ineffective assistance of Richardson's trial counsel is the affidavit of Steven Decker, an

experienced criminal defense attorney who was engaged in the defense of criminal

cases in the Cook County courts at the time of Richardson's trial.  Decker states that at

the time, given a recent Illinois Appellate Court decision (*People v. Payne*, 106 Ill. App.

3d 1034, 436 N.E.2d 1046 (1982), discussed at length in this Court's prior decision, *see*

*Richardson v. McCann*, 653 F. Supp. 2d at 848-49), criminal defense attorneys

practicing in the state court were commonly aware that there was a developing trend in

---

[7] None of the cases respondent cites to the contrary involved the situation here,
in which a lower state court decided a claim on its merits but the final state court
decision was expressly procedurally-based and did not involve the merits at all.

the law that would permit challenges to a prosecutor's racially discriminatory use of peremptory challenges in a particular case (contrary to *Swain*). Decker himself asserted what this Court has previously called a "proto-*Batson*" claim in January 1985 and eventually, after collateral review, obtained a hearing on that claim.

Decker's affidavit is uncontradicted, and it is persuasive. And in Richardson's trial, given the prosecutors' use of their peremptory challenges to strike sixteen black jurors (and only black jurors), there was certainly enough to trigger the assertion of a proto-*Batson* challenge. If it is determined – contrary to the Court's primary "cause" ruling – that a *Batson* claim was reasonably available to Richardson's trial counsel even though *Batson* had not yet been decided, the fact that criminal defense lawyers were commonly aware that such challenges could and should be asserted renders the failure of Richardson's counsel to do so objectively unreasonable. The Court also adopts in this regard its previous discussion of the ineffective assistance / cause issue. *See Richardson v. McCann*, 653 F. Supp. 2d at 846-49. Richardson has demonstrated ineffective assistance as an alternate basis of "cause" for the procedural default of his *Batson* claim.

**5. The merits**

In this section, the Court addresses the merits of Richardson's *Batson* claim for the dual purpose of assessing "prejudice" under the cause-and-prejudice analysis and to determine the merits of the claim as a matter of federal law assuming that prejudice is established. These inquiries are obviously intertwined. Because the Illinois Supreme Court did not determine Richardson's *Batson* claim on its merits, this Court reviews the

claim *de novo*. *See, e.g., Byers v. Basinger*, 610 F.3d 980, 989 n. 6 (7th Cir. 2010); *Gonzales v. Mize*, 565 F.3d 373, 384-85 (7th Cir. 2009); *see* 28 U.S.C. § 2254(d) (limiting deference to "any claim that was adjudicated on the merits in State court proceedings.").

*Batson* provides for a three-step analysis in a case involving a claim that prosecutors used their peremptory challenges to strike a prospective juror based on race. The defendant first must establish a *prima facie* case of discrimination by showing facts and circumstances that raise an inference of discrimination. If the defendant does so, the prosecution may offer a race-neutral explanation for the challenged strike. Third, the defendant may offer additional evidence to show that the claimed justification is pretextual or that otherwise shows the strike was motivated by a discriminatory purpose. *Batson*, 476 U.S. at 93-94, 97, 98.

A discriminatory strike of even a single juror violates an accused's constitutional rights. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). This was apparent in *Batson* itself, where the Court made it clear that "[r]acial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try" but also "unconstitutionally discriminate[s] against the excluded juror." *Batson*, 476 U.S. at 87 (citing, among other cases, *Strauder v. West Virginia*, 100 U.S. 303, 308 (1879)).

### a. *Prima facie* case

A court is to consider "all relevant circumstances" in deciding whether a party has made out a *prima facie* case. *Batson*, 476 U.S. at 96. Among particular factors considered are whether there was a pattern of using strikes against black jurors, *see id.*

36

at 97, and whether the underlying crime involved a "racially sensitive" set of facts, such as a black defendant accused of a crime against a white victim. *See Mahaffey v. Page*, 162 F.3d 481, 485 (7th Cir. 1998).

"In determining whether a pattern is present, courts have . . . considered whether a disproportionate number of peremptory challenges were used to exclude members of a particular cognizable group." *United States v. Stephens*, 421 F.3d 502, 512 (7th Cir. 2005) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 331, 342 (2003)). Based on the record as it now stands, it is undisputed that the prosecution used every one of the sixteen strikes that it exercised to strike black jurors. This amounted to use of one hundred percent of its strikes against members of a racial group that comprised fifty-six percent of the prospective jurors tendered to the prosecution for consideration during voir dire and forty-eight percent of the overall venire.

It is tempting to look at the final composition of the jury – one-third black – and say that the results do not appear discriminatory. But *Batson* does not establish a proportional representation regime under which a party's peremptory challenges stand or fall based on the ultimate composition of the jury. Though the presence of black jurors matters in the final analysis of whether discrimination has been proven, even a single discriminatory strike violates the Constitution. Thus, the fact that the prosecution did not strike all of the black jurors is not determinative.

In any event, given the number of black jurors in the venire, the prosecution could not have stricken all of them, even if it had used all twenty of its strikes. The state is not immunized from *Batson* scrutiny simply because the composition of the venire is such that complete elimination of members of a particular racial group is mathematically

impossible.

In addition, the crime involved a black defendant accused of committing a violent crime against a white victim. This was also true of the earlier shooting that the prosecution offered into evidence at trial. Thus the case involved racially sensitive matters.

The Court concludes that the prosecution's pattern of strikes, the fact that it used all sixteen that it exercised against black jurors, and the fact that the crime involved racially sensitive facts together are more than sufficient to establish a *prima facie* case under *Batson*.

The state trial judge determined, when considering Richardson's post-conviction petition, that Richardson had failed to make out a *prima facie* case of discrimination. Respondent does not appear to argue in his post-hearing briefs that this conclusion is entitled to a presumption of correctness under 28 U.S.C. § 2254(e). Any such argument would lack merit. Even if section 2254(e) applies *at all* to the state trial judge's ruling despite the fact that it was not the final decision of the Illinois courts on the *Batson* claim, the presumption of correctness does not apply to the trial judge's ultimate conclusion that Richardson had failed to establish a *prima facie* case. That conclusion involved the application of law to fact, in other words, a mixed question. Under section 2254(e), only findings of fact are presumed correct; the presumption does not apply to mixed questions of law and fact. *See, e.g., Wright v. Walls*, 288 F.3d 937, 942 (7th Cir. 2002); *Shasteen v. Shaver*, 252 F.3d 929, 933 (7th Cir. 2001).

That aside, no presumption of correctness applies to the state trial judge's

subsidiary findings of fact. The state trial court's decision is not the operative state court decision on the *Batson* issue. The final ruling of the Illinois courts was the Illinois Supreme Court's decision that Richardson had forfeited his *Batson* claim. Having reached that conclusion, the Illinois Supreme Court had no occasion to address challenges to the trial judge's findings. Because a superior state court decided the case on different grounds from the trial court, the trial court's findings would have no preclusive effect even in state court. *See Thomas*, 570 F.3d at 115. The Court sees no basis on which those findings are entitled to the section 2254(e) presumption of correctness in the present proceeding.

Even if the presumption of correctness applies to the state trial judge's findings, Richardson has rebutted the presumption by clear and convincing evidence. In reaching his conclusion that Richardson had failed to make out a *prima facie* case under *Batson*, the trial judge listed the following circumstances as factors to be considered: 1) racial identity between the defendant and the excluded jurors; 2) a pattern of strikes against black jurors; 3) a disproportionate use of peremptory challenges against black jurors; 4) the level of black representation in the venire as compared to the jury; 5) questions and statements by the prosecutors during voir dire; 6) whether the excluded jurors "were a heterogenous group sharing race as their only common characteristic"; 7) the race of the defendant, the victim, and witnesses; and 8) the trial judge's experience with local prosecutors and knowledge of local conditions. *People v. Richardson*, No. 82-9391, slip op. at 17 (Cir. Ct. Cook Cty. Mar. 4, 1997).

The state trial judge made his findings and conclusions based on a record that

did not include evidence regarding the race of a number of the prospective jurors – evidence that now is a part of the record.  Based on the limited record before him, the judge made the following findings:

1)      He concluded that the race of prospective jurors Smith, Tolbert, and McDonald "is not apparant [sic] from the record" and thus would not be considered.  *Id.* at 21.  He stated that the remaining excluded jurors were black, as was Richardson, but that this was not dispositive.  *Id.*

2)      The judge said that due to "[t]he absence of evidence of the number of African-Americans in this group," i.e., the pool of jurors not challenged for cause, he could not determine whether there was a pattern of strikes against black jurors, making that a neutral factor.  *Id.* at 22.

3)      The judge said that he could not conclude that there was a disproportionate use of strikes against black jurors, due to the absence of evidence concerning the race of some jurors.  He stated that "at least 81%" of the prosecution's sixteen strikes were used against black jurors (thirteen of sixteen); of the fourteen jurors and alternates seated, eight were white and three were black; but the race of the others was unknown.  *Id.*

4)      The judge stated that it was "impossible to discern" the level of black representation in the venire as compared to the jury.  *Id.*

5)      Because the original trial judge had conducted the voir dire himself, there were no comments or questions by the prosecution during the voir dire, making that a neutral factor.  *Id.*

6) The judge rejected Richardson's contention that the only factor the excluded black jurors shared was their race. He stated that each of them "share another obvious characteristic. None had been the victim of a crime." *Id.* at 23. The judge also noted that two of the jurors of unknown race whom the prosecution excluded shared this same characteristic, and that the race of the third, Roy Tolbert, was unknown. *Id.* The judge went on to note that nine of the thirteen black jurors the prosecution had excluded were dissimilar to white jurors, in that two had family members who had been killed, one was a convicted felon, two were unemployed, one had served on a grand jury, one was a single mother of four, one was a teacher, and one (Tolbert) had sued his employer; whereas none of the white jurors shared these characteristics. *Id.* at 23-24. The judge stated that "only four of the excused venirepersons, Joan Overton, Stanley Purnell, Alberta Tucker and Elester Wilson could possible be called a heterogeneous group sharing race as their only common characteristic (assuming one ignores the fact that none had been the victim of a crime)." *Id.* at 24. The judge also noted that the prosecution had accepted some African-American jurors. He concluded that the seventh factor "does not warrant an inference of discrimination." *Id.*

7) The judge noted that Richardson was black, the victim was white, and the record was not clear regarding the witnesses' race, meaning that factor favored the defendant. *Id.* at 24-25.

8) With regard to the last factor the judge considered, he indicated

that assuming there were three black jurors and alternates out of fourteen, the resulting percentage of twenty-one percent was "very close to the percentage of African-Americans in Cook County, about 25%. This does not warrant an inference of discrimination." *Id.* at 25 (citation omitted). The judge also noted that the prosecution had not used all of its peremptory challenges and concluded that "[t]hese facts do not show an intent to discriminate." *Id.*

Based on these findings, the state trial judge concluded that Richardson had failed to establish a *prima facie* case of discrimination under *Batson*. *Id.*

Even if – contrary to this Court's conclusion – the presumption of correctness applies to the state trial judge's findings, Richardson has rebutted it by clear and convincing evidence as to the most significant factors the state trial judge addressed. Factor 1) identified by the trial judge, on which he said he was unable to make a finding, was whether Richardson and the excluded jurors were of the same race. It is now clear that jurors Smith, McDonald, and Tolbert all were black and thus that all sixteen jurors the prosecution excluded were the same race as Richardson. Factor 2) concerned whether there was a pattern of strikes against black jurors. The trial judge said he could not make a finding on this due to the claimed absence of evidence of the number of black jurors stricken. It is now clear that the prosecution used all sixteen of its challenges to strike black jurors. If this is not "a pattern of strikes against African-American venirepersons," *id.* at 22, it is hard to know what would be.

Factor 3) identified by the state trial judge was whether the prosecution had made a disproportionate use of its peremptory challenges against black jurors. The judge said he could not make a finding on this point either. It is now clear that the

42

prosecution disproportionately used its challenges to strike black jurors. It used one hundred percent of the challenges that it exercised to strike black prospective jurors, even though black jurors represented only fifty-six percent of the jurors tendered to the prosecution. As to factor 4), contrary to the state trial judge's determination, the proportion of black persons among the jury venire cannot be said to be "impossible to discern." The venire, omitting jurors excused for cause and the two whose race is unknown, was fifty-two percent white and forty-eight percent black. This compares with percentages of sixty-seven percent whites and thirty-three percent blacks on the jury that decided the case.

The other factors identified by the state trial judge are not affected in any significant degree by the additional evidence now part of the record. But based on the record as it now exists, the Court has no hesitation in concluding that Richardson had made out a *prima facie* case of discrimination as to one or more of the sixteen black prospective jurors whom the prosecution struck. The case was racially charged (a white victim, or actually two if one counts the other-crimes evidence, and a black defendant), and the prosecution excused only black jurors even though white jurors made up around half of those tendered. The result was a jury with a super-majority of white members, even though those tendered were racially split about fifty-fifty. Richardson has established a *prima facie* case under *Batson.*

<h3>c.  Race-neutral explanations</h3>

At the second step in the *Batson* analysis, the prosecution may offer a race-neutral explanation for each of the challenged strikes. *Batson*, 476 U.S. at 97. The

prosecution was not called upon to do so at any stage of the state court proceedings. The first time the prosecution was ever asked to explain any of its strikes was by this Court, in connection with the evidentiary hearing the Court ordered.

Respondent obtained affidavits from the two trial prosecutors, Henry Lazzaro and John Hynes. Those affidavits were dated, respectively, March 2009 and April 2009 – twenty-five years after Richardson's trial. Neither prosecutor had any memory of their reasons for their challenges, but each denied engaging in race discrimination. Lazzaro stated as follows in his affidavit:

> 3.      I do not have any notes I may have made during [the] voir dire proceedings.
>
> 4.      I have reviewed the transcript of the voir dire, but that transcript has not refreshed my recollection in any way.
>
> 5.      I do not recall our reasons for our peremptory challenges of potential jurors.
>
> 6.      It was always my practice to consult with my co-counsel before exercising a peremptory challenge, but once against I do not have any recollevction of the reason(s) for any particular challenge.
>
> 7.      It has never been my practice to engage in racial discrimination during jury selection.

Lazzaro Affid. ¶¶ 3-7.[8]  Hynes made similar statements and also added that at the time of Richardson's trial, he was aware of an Illinois Appellate Court decision, *People v. Payne*, 106 Ill. App. 3d 1034, 436 N.E.2d 1046 (1982), in which the court had (in a

---

[8] There is no basis in the record to believe that Lazzaro or Hynes would have had any better recollection of the reasons for their strikes had they been called upon to explain them during the course of the Illinois post-conviction proceedings.  By the time those proceedings reached a point at which the state trial court considered the claim on the merits, a dozen years had passed since Richardson's trial.

precursor of *Batson*) reversed a conviction due to race discrimination during jury selection. *See* Hynes Affid. ¶¶ 4-9.

Both Lazzaro and Hynes repeated at the evidentiary hearing that they did not take race into account in selecting jurors. And both stated that they had never been the subject of a *Batson* claim or argument. Neither of them, however, identified or attempted to identify their habits or practices regarding the types of jurors they sought to include or exclude in prosecuting criminal cases generally or cases like Richardson's specifically.

Richardson argues that because neither prosecutor has articulated a race-neutral reason for any of the strikes, respondent has failed to satisfy its burden and thus the prosecutors must be deemed to have acted based on race. He relies largely on two Second Circuit cases, *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir. 1992), and *Harris v. Kuhlmann*, 346 F.3d 330, 348-49 (2d Cir. 2003). Alternatively, Richardson argues that even if the Court concludes that the second step in the *Batson* analysis is only a production burden, leaving the ultimate burden of persuasion on race discrimination with the defendant in the criminal case, he has satisfied that burden – partly because the prosecutors have offered no race-neutral explanations. *See, e.g., Paulino v. Harrison*, 542 F.3d 692, 702-03 (9th Cir. 2008); *Yee v. Duncan*, 463 F.3d 893, 898-99 & n.2 (9th Cir. 2006).

The Court rejects Richardson's argument that the prosecutors' inability to offer race-neutral justifications, without more, requires a conclusion that they discriminated based on race. The primary case on which Richardson relies was a case in which the

criminal defendant's trial counsel made contemporaneous *Batson* or proto-*Batson* objections. *See Harris*, 346 F.3d at 339-40; *Brown*, 973 F.3d at 121. Richardson did not do so. It is one thing to permit him, as the Court has done, to excuse the absence of a contemporaneous objection and allow him to pursue his *Batson* claims. It is another thing altogether to permit Richardson to benefit from his trial counsel's failure to make a contemporaneous objection by obtaining what amounts to a judgment by default. That is effectively what the Court would be doing were it to accept Richardson's argument regarding the effect of the prosecutors' failure of recollection.

Through no fault of their own, the prosecutors were not called upon to give reasons for their peremptory challenges until twenty-five years after the fact.[9] And this was in a case that was tried in the pre-*Batson* landscape, making it relatively unsurprising that the prosecutors had no notes memorializing the reasons for their peremptory strikes. The Court declines to conclude that the prosecutors' absence of any recollection of their reasons for striking particular jurors, without more, entitles Richardson to a new trial.

Richardson's alternative argument is largely based on the analysis adopted by the Ninth Circuit in *Yee* and *Paulino*. Both were cases in which, unlike in Richardson's case, defense counsel made a contemporaneous objection at trial to the prosecutor's exercise of peremptory challenges. In *Yee*, the prosecutor was called upon at trial to

_____

[9] As stated earlier, the prosecutors' conduct was not even called into question for the first time until Richard filed his post-conviction petition in early 1991, nearly seven years after the trial, and the petition was not considered on its merits until 1996, twelve years after the trial.

give an explanation but was unable to justify one of several challenged strikes. In *Paulino*, the trial judge declined to direct the prosecutor to justify the strikes but instead hypothesized race-neutral reasons why the prosecutor might have done so. At a hearing held a little under eight years later, as part of a federal habeas corpus proceeding, the prosecutor attempted to hypothesize race-neutral reasons based on her notes but did not recall her actual reasons. In both cases, the Ninth Circuit concluded that the second step of the *Batson* analysis imposes a burden of production, not a burden of persuasion, and thus that the prosecution's inability to provide actual reasons for a juror strike is not automatically fatal to its defense against a *Batson* challenge decided on the merits well after the fact. Rather, the court concluded, the burden of persuasion on the issue of race discrimination remains with the proponent of the *Batson* claim, with the prosecution's inability or unwillingness to provide an explanation as a factor supporting an inference of discrimination. *See Paulino*, 542 F.3d at 703; *Yee*, 463 F.3d at 898 n.2, 899. In *Paulino*, the court went somewhat further, stating that

> [w]here the state fails to meet its burden of production [at step two], the evidence before the district court at step three – the prima facie showing plus the evidence of discrimination drawn from the state's failure to produce a reason – will establish purposeful discrimination by a preponderance of the evidence in most cases. Indeed, in such cases, there is no race-neutral evidence to weigh.

*Paulino*, 542 F.3d at 703 (footnote omitted).

This Court agrees that in the unusual circumstances involved here, the prosecution's inability to offer race-neutral justifications for its strikes twenty-five years after the fact does not relieve Richardson of his burden of proving race discrimination.

47

The Court likewise takes no issue with the fact that the absence of a proffered actual justification is a factor to be considered in determining whether Richardson has met that burden. In the present case, however, it would be unfair to make that a dispositive factor.

Given the unusual circumstances of this case, however, the Court believes and concludes that it is appropriate to permit respondent to argue rationales for the prosecution's strikes of black jurors that are consistent with the evidence of record, even though the trial prosecutors cannot attest that these were the actual justifications for the challenged strikes. Respondent's ability to obtain evidence of the prosecutor's actual motivations has been significantly impaired, due entirely, or almost entirely, to the failure of Richardson's counsel to make contemporaneous objections.[10] Given these factors, it is appropriate to permit respondent to attempt to reconstruct circumstantially the prosecutors' likely rationales, with the fact that these rationales are reconstructed and circumstantial affecting their weight but not whether the Court may consider them. As the Third Circuit has noted,

> [t]here will undoubtedly be post-conviction relief proceedings in which the state, by reason of death, absence, or faded memory, will be unable to produce a prosecutor with a specific recollection of the reason for a challenge alleged to violate *Batson*. Courts frequently are required to draw inferences from circumstantial evidence regarding a decision-maker's state of mind, however, and we are unwilling to rule out the possibility that the state may be able to satisfy its step two *Batson*

---

[10] Another factor is the extended period that various courts, including this one, had Richardson's case under advisement. The Court notes, however, that respondent did not offer any evidence regarding the usual practice of these prosecutors, or prosecutors generally at the relevant time, regarding the sorts of jurors they tended to include and exclude. That, too, is a factor the Court will take into account in the *Batson* analysis, at the third stage.

burden by tendering circumstantial evidence.

*Johnson v. Love*, 40 F.3d 658, 667 (3d Cir. 1994).

That said, it is respondent's job to construct the circumstantial case for the prosecutors, not the Court's job. It is therefore appropriate for the Court to confine its review to the proposed justifications that respondent has offered for consideration. The Court will not attempt to divine additional reasons why the prosecutors struck or might have stricken black prospective jurors beyond the reasons respondent has offered.

In his post-hearing memorandum, respondent argued that the trial prosecutors' peremptory challenges reflected a preference for jurors who had been crime victims, owned their homes, and/or had been steadily employed, and a corresponding aversion to prospective jurors who did not share one or more of these characteristics. Resp.'s Post-Hearing Brief at 5-9. Respondent also argued, in his post-hearing memorandum and his amended answer to Richardson's habeas corpus petition, additional proposed rationales for particular strikes. *See id.* at 9-10 (regarding prospective juror Michael Upshire); Resp.'s Am. Ans. at 37-38 (regarding prospective jurors Michael Upshire, Delores Allen, Judith Smith, Rosie McGee, Emma Redmond, Alberta Tucker, Evelyn Dixon, and Joan Overton).

More specifically, respondent argued the following:

- "[T]he prosecutors had a demonstrated preference for people who had themselves been crime victims. Not a single one of the potential jurors excused by the State had been a victim of a crime, but the State accepted six crime victims . . ., two of whom were African-American . . ., and one of whom ended up serving on the jury." Resp.'s Post-Hearing Brief at 5-6 (citations omitted).

49

- The record . . . also shows the prosecutors' disinclination to accept venirepersons who rented, lived with relatives, or stayed with someone else in an impermanent or ambiguous living arrangement. Of the venirepersons for whom this information is known, 86% of those accepted by the State [ten of the thirteen jurors] owned their own homes." *Id.* at 6 (footnote omitted). Of the other three, two had lived at their current addresses for ten years or more, and the third lived with his mother but paid room and board.

- "The record persuasively suggests that the prosecutors were seeking jurors who had been steadily employed, as compared with those who had sporadic or marginal employment. In petitioner's case, *all* of the seated jurors were employed." *Id.* at 8. This included the five black jurors and alternates. Four of the black prospective jurors the prosecutors excluded were unemployed or sporadically employed. *Id.* at 9.

- As to particular jurors, respondent argued:

    - Prospective juror Michael Upshire had a prior felony conviction that he had not disclosed on his juror card. *Id.* at 9-10; Resp.'s Am. Ans. at 37-38.

    - Delores Allen had served on a grand jury but did not know whether she had served on the grand jury that indicted Richardson. Resp.'s Am. Ans. at 38.

    - Judith Smith, Rosie McGee, and Emma Redmond were "currently employed as social workers or teachers" and may have been perceived as

likely to acquit.  *Id.*  (In his post-hearing reply brief, respondent also noted that a fourth juror, Roy Tolbert, had been an elementary school teacher in the past.  *See* Resp.'s Post-Hearing Reply at 6-7.)

-       Emma Redmond's uncle had been murdered.  *See* Resp.'s Am. Ans. at 38.

-       Alberta Tucker's niece had been stabbed, and Tucker made a confusing statement about that event.  *Id.*; *see also* Resp.'s Post-Hearing Reply at 8.

-       Roy Tolbert was a named plaintiff in what the trial transcript refers to as a "title severance" case, and his brother had been stabbed.  *See* Resp.'s Am. Ans. at 38.

-       Wanda Dixon, respondent claimed,  "had difficulty understanding and answering a question," and her son had been killed in an unresolved incident.  *Id.*; *see also* Resp.'s Post-Hearing Reply at 7-8.

-       Joan Overton "indicated an unwillingness to follow the law" or a disregard for the conditions of her employment by stating that she was on sick leave but had not return to work even though she was no longer sick.  *See* Resp.'s Am. Ans. at 38.

Each of these – assuming it is supported by the record – is a facially race-neutral explanation.

### d.    Pretext / discriminatory purpose

The Court considers next whether Richardson has met his burden of proving that

respondent's proffered reasons for the prosecutors' peremptory strikes of particular black jurors are pretextual or that evidence otherwise shows the prosecutors had a discriminatory purpose for any particular strike.

The appropriate method of analysis in a case such as this is to compare black jurors whom the prosecution struck with white jurors whom it accepted to determine if they shared characteristics. *Mahaffey*, 162 F.3d at 485-86 ("[R]ather than comparing the excused African-Americans to the excused whites, the trial judge should have been comparing the excused African-Americans to the jurors who remained, for only through such a comparison could the judge assess whether race played any role in the State's challenges."). If an excused black juror had characteristics similar to those of a juror whom the prosecution did not strike, this would suggest racially-motivated use of a peremptory challenge against the struck black juror. *Id.*

### i. Respondent's three primary proposed justifications

Respondent suggests that the prosecutors were looking for jurors who were crime victims, homeowners, and/or were stably employed. No one of these reasons by itself would pass muster: prosecutors accepted a number of white jurors who had not been crime victims; a number who were not homeowners; and a number who were not stably employed. They likewise struck one black juror who had been a crime victim, some who were homeowners, and some who had stable employment. Thus if the Court were to assess these hypothesized rationales on a factor-by-factor basis, they would not withstand scrutiny.

The Court does not understand respondent, however, to contend that any single one of these three factors explains any particular strike of a black prospective juror.

Rather, respondent appears to contend that what was relevant was the entire picture.

*See Stephens*, 514 F.3d at 711. As the Seventh Circuit explained in *Stephens*,

> When making a side-by-side comparison of included and excluded jurors, the district court should be mindful that "[p]icking jurors is a complex and multifaceted process. Individual factors or characteristics often do not provide the 'silver bullet' that will mean acceptance or rejection of any potential juror. Rather, it is a combination of factors that will determine whether a party believes a juror will be favorable to their side."

*Id.* (quoting *Pruitt v. McAdory*, 337 F.3d 921, 930-31 (7th Cir. 2003)).

There are several problems, however, with respondent's hypothesized justifications. First, prosecutors accepted two white jurors tendered for selection, Mitchell Szeszycki and Ronald Bogs, who had *none* of the cited characteristics. Respondent has provided no explanation for this differential treatment. Prospective juror Szeszycki was a laid-off former operations manager who had worked for his prior employer for only two and one-half years, had been living with his parents for the previous three years, and was not a crime victim. *See* Trial Tr. 296-98. Prospective juror Bogs was a laid-off former "verifier" for Commonwealth Edison who had worked there for two and one-half years and had been laid off for about six months at the time of trial. *See* Trial Tr. 126-27. His juror card reflected that he was not a crime victim and did not own his home. The prosecution accepted both of these jurors.[11] This suggests that crime victim status, home ownership, and steady as opposed to "sporadic" or "marginal" employment were criteria that the prosecutors applied to black jurors but not to similarly situated whites.

---

[11] The defense struck Szeszycki, but that is of no consequence. The Court is assessing how the *prosecution* dealt with tendered jurors.

In addition, careful review of the record reveals that assuming the prosecution actually was using respondent's hypothesized criteria in various combinations, it applied them in one way to black jurors and in another way to white jurors.  First, contrary to respondent's argument that the prosecutors struck no jurors who were crime victims, one of the struck black jurors, Roy Tolbert, *was* a crime victim.[12]  Second, even if one includes Tolbert among those who were not crime victims as respondent contends, the prosecutors struck six black jurors who were not crime victims but owned their homes and were stably employed (Elester Wilson, Evelyn Dixon, Roy Tolbert, Rosie McGee, Alberta Tucker, and Emma Redmond), while accepting eight white jurors who shared these characteristics (Robert Ladd, Richard Brandstedt, Louis Mandoky, Joseph Hozian, Frank Silhavy, Thomas Berlin, Thomas McKee, and Roberto Orozco).  In addition, the prosecution struck two black jurors who were neither crime victims nor homeowners but were stably employed (Delores Allen and Judith Smith), while accepting a white juror (Irma Blatse) who shared these characteristics.

The following table illustrates these particularized comparisons, identifying the three key criteria hypothesized by respondent:

| White jurors accepted by prosecution | Black jurors stricken by prosecution |
| --- | --- |
| <u>Thomas Berlin</u> - Not a crime victim; homeowner; staff accountant at Standard Oil for thirty years.  (Trial Tr. 222-24) | <u>Evelyn Dixon</u> - Not a crime victim; homeowner; secretary at Cook County Hospital for nineteen years.  (Trial Tr. 189-92) |

---

[12] Tolbert actually was a crime victim, contrary to respondent's contention (and the state trial judge's finding) that "[n]ot a single one of the potential jurors excused by the State had been a crime victim."  Resp.'s Post-Hearing Brief at 5-6.  *See* Trial Tr. 312 (Tolbert states that "[m]y house was burglarized.  I had a car stolen . . . .").

| | |
|---|---|
| Richard Brandstedt - Not a crime victim; homeowner; pharmacist at V.A. Hospital for eight years. (Trial Tr. 284-86) | Rosie McGee - Not a crime victim; homeowner; teacher's aide at Chicago Board of Education for ten years. (Trial Tr. 228-30) |
| Joseph Hozian - Not a crime victim; homeowner; welder at Electromotive Division for twenty years. (Trial Tr. 210-13) | Emma Redmond - Not a crime victim; homeowner; administrator at Illinois Dept. of Mental Health for six years. (Trial Tr. 292-95) |
| Robert Ladd - Not a crime victim; homeowner; driver at United Parcel for six years. (Trial Tr. 127-29) | Roy Tolbert - A crime victim; homeowner; shipping checker at General Motors for fifteen years. (Trial Tr. 309-12) |
| Louis Mandoky - Not a crime victim; homeowner; driver at Wards Cartage for ten years. (Trial Tr. 185-89) | Alberta Tucker - Not a crime victim; homeowner; postal clerk with U.S. Postal Service for twenty-one years. (Trial Tr. 281-84) |
| Thomas McKee - Not a crime victim; homeowner; construction superintendent for Waner Corp., with company for twenty-eight years. (Trial Tr. 313-15) | Elester Wilson - Not a crime victim; homeowner; lift truck operator for Lifschultz Freight for sixteen years. (Trial Tr. 145-47) |
| Roberto Orozco - Not a crime victim; homeowner; claims representative at Social Security Administration for seven years. (Trial Tr. 320-22) | |
| Frank Silhavy - Not a crime victim; homeowner; forklift operator at Certified Grocers for ten years. (Trial Tr. 206-10) | |

| White jurors accepted by prosecution | Black jurors stricken by prosecution |
|---|---|
| Irma Blatse - Not a crime victim; not a homeowner (renter per juror card; no questioning by court on that topic); repair clerk for Illinois Bell for eighteen years. (Trial Tr. 214-16) | Delores Allen - Not a crime victim; not a homeowner (divorced and living with cousin for seven years); clerk at Warshawsky's Auto Parts for nine years. (Trial Tr. 120-23) |
| | Judith Smith - Not a crime victim; not a homeowner (renter at same address for seventeen years); special education teacher at Chicago Board of Education for twenty-seven years. (Trial Tr. 170-73) |

Respondent has also suggested possible explanations for the prosecutors strikes of some, though not all, of the black prospective jurors just referenced.  The Court proceeds to address whether those hypothesized explanations are supported by the record.

*Rosie McGee, Emma Redmond, Roy Tolbert & Judith Smith.*  With regard to prospective jurors McGee, Redmond, Tolbert, and Smith, respondent says that they were or had been employed as teachers or social workers.  Specifically, McGee was a teacher's aide at the Chicago Board of Education; Tolbert, earlier in his life, had been an elementary school teacher (and his wife taught students with learning disabilities); and Smith was a special education teacher.  Contrary to respondent's argument, Redmond (who was married to a teacher) does not appear to have been a social worker.  However, she worked for the Illinois Department of Mental Health and designed training programs for alcoholism counselors.

In his post-hearing memorandum, respondent notes that the employment history of these jurors could have been a factor in the prosecutors' decision to strike them because there was evidence that Richardson had an IQ at the very low end of the normal range and that he claimed to have a chronic substance abuse problem.  The problem with respondent's citation of these factors is that there was no basis to believe that any such evidence would be introduced at the guilt phase of the trial,[13] and

---

[13] In addition, Richardson's trial counsel do not appear to have been aware of this evidence at the time, as discussed earlier in connection with Richardson's separate ineffective assistance claim.  It stands to reason that the prosecutors could not possibly

(continued...)

Richardson had waived a jury for the death penalty phase. As a result, the jurors were not going to be exposed to evidence regarding his mental or substance abuse status, and the trial prosecutors knew it. This is not a plausible basis supported by the record for their striking of any of these prospective jurors.

Respondent also contends, however, that striking these jurors based on the nature of their employment would have been warranted because "teachers and social workers may be more sympathetic to the defense . . . ." Resp.'s Post-Hearing Reply at 7. In this Court's experience, the notion that teachers and social workers may be more willing to acquit, whether or not it is true, is an element of conventional wisdom among many prosecutors and defense lawyers. This is also a race-neutral criterion; these are not the sorts of professions that are populated entirely, or almost entirely, by members of particular racial groups. *See Copeland v. Walker*, 258 F. Supp. 2d 105, 127 (E.D.N.Y. 2003) (upholding strike of a juror whose volunteer work that, "like certain occupations in social work or counseling, might make him a more suitable target for a peremptory challenge") (citing *United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir. 1991)). In addition, it does not appear that any of the white jurors whom the prosecution accepted were or had been employed as teachers or social workers.

*Alberta Tucker*. With regard to Alberta Tucker, respondent cites as a possible reason for striking her the fact that her niece had been stabbed and that Tucker made a confusing statement about this during voir dire. *See* Resp.'s Am. Ans. at 38; Resp.'s

_____

[13](...continued)
have rested their decision-making on this factor, as there was no indication that any such evidence would be offered at all.

Post-Hearing Reply at 8.  Respondent's citation of the fact that Tucker (as well as two other jurors previously addressed, Emma Redmond and Roy Tolbert) had *relatives* who were crime victims does not provide a plausible non-discriminatory basis for the prosecutors to strike her.  Indeed, prosecutors *did not* strike a white juror, Irma Blatse, even though her niece had been murdered.  Trial Tr. 215-16.  And respondent has taken pains to point out, in discussing the prosecutors' hypothesized reliance on jurors' crime victim status as a basis for peremptory challenges, that "the prosecutors excused [certain jurors] *because they had not themselves been victims of crime, and not because of what may or may not have happened to their friends or to members of their families.*"  Resp.'s Post-Hearing Reply at 7 (emphasis added).  Respondent cannot have this both ways.

Respondent also says that Tucker "gave an odd response" about the death of her niece.  *Id.* at 8.  Here is the exchange between the trial judge and Tucker:

> Q:      You indicated to me, Ms. Tucker, when I asked the general questions, that you do know people that both have been convicted of a crime and been the victim of a crime, is that correct?
>
> A:      Yes.
>
> Q:      Can you tell us something about each of those circumstances, ma'am?
>
> A:      They're really both related.  My niece was the victim of a crime. She was stabbed by her stepfather, who was my sister's second husband, and it happened in her home.  I was called in on it, too, at the last moment, when she was taking her out.  The man was convicted.  He has served his time and that's it.
>
> Q:      And this is the double answer to – the same answer to two questions, really?

A:      Right.

Q:      I presume, Ms. Tucker, that you understand why I am asking you these things?

A:      Yes.

Q:      Is it going to have any bearing on your ability to give both sides a fair trial?

A:      No.

Trial Tr. 283. (The Court notes that respondent does not argue, or hint, that the fact that Tucker's sister's second husband was convicted of a crime could have been the prosecutors' basis for striking her.)

The part of Tucker's answer that respondent characterizes as "odd" is her statement that "I was called in on it too, at the last moment, when she was taking her out." Resp.'s Post-Hearing Reply at 8 n.8. It is hard to see anything "odd" about this; Tucker quite plainly was saying that she had been called to her sister's home when her niece was being taking out of the home after having been stabbed. That aside, however, respondent also argues that the prosecutors reasonably could have concluded that the next juror in line, Gerald Curran, "was a more desirable juror" than Tucker given her arguably confusing response to the questions about her niece's murder. *Id.* at 8. Though this is arguably too vague to amount to a viable non-discriminatory basis for the strike, the Court will consider it as such.

*Delores Allen*. The only particularized basis that respondent hypothesizes for the prosecutors' strike of Delores Allen is that she had served on a grand jury but did not know whether it was the grand jury that had indicted Richardson. *See* Resp.'s Am. Ans. at 38. This is a very strained argument. Allen stated that she had sat on a grand

59

jury that served in April or May 1982. Richardson was indicted in October 1982, *see* R. 1040-48, and the prosecutors quite clearly knew this or at least had ready access to this information in the courtroom. Thus there was zero chance that Allen had sat on the grand jury that indicted Richardson or that the prosecutors thought this could be the case.

In the exchange that respondent cites, the trial judge asked Allen, "You weren't on that Grand Jury that indicted [Richardson], were you?," and she replied, "I don't know." The judge followed up by asking, "Do you remember his name or any of these names we have discussed?," and Allen replied, "No." Trial Tr. 123-24.

The record does not support a plausible contention that this could have been the prosecutors' actual reason for striking Allen. It is well known, and would have been well known to the trial prosecutors, that grand juries – particularly local grand juries – return dozens if not hundreds of indictments, typically based on a very brief summary of evidence from a police officer that takes up only a few pages of transcript. It is not reasonable to believe that a prosecutor would have considered the fact that Allen did not remember a particular case from her grand jury service two years earlier to be a reason to strike her from the jury, whether alone or in combination with other factors.

*Wanda Dixon*. With regard to prosecutors' strike of prospective juror Wanda Dixon, respondent offers as its sole hypothesized explanation the claim that Dixon "had difficulty understanding and answering the simple question 'where does your son work?'" Resp.'s Post-Hearing Reply at 7-8 & 8 n.7. This claim finds no support whatsoever in the record.

The Court first quotes in full respondent's argument from his post-hearing reply

60

brief:

> There were unique reasons to excuse Dixon and Tucker.  Dixon, who was the twenty-ninth person to be questioned, had difficulty understanding and answering the simple question "where does your son work?"[7]
>
> [7]Dixon indicated she had a twenty-three-year-old son who was currently employed as a transporter at Cook County Hospital:  "I have a son, 23 year old son, transporter at Cook County Hospital."  But when asked "did you say transporter?", Dixon switched and said "My son *was* [past tense] a transporter at *St. Francis Hospital* [different hospital] and I am very amazed, they give everybody a rank.  He's *got* [present tense] a little badge and picture and whatever that says, I've got to get the initials down, PTT.  That's my son, the Physical Therapy Transporter."  (R. 190) (emphasis added).  When the judge asked "what kind of transporter is your son," she said "he transports patients."  (*Id.*)

Resp.'s Post-Hearing Reply at 8 & n.7 (emphasis in original).

Respondent has patently misunderstood or misread the transcript.  Dixon never said her son had worked anywhere other than Cook County Hospital, and in particular she did not say that her son had worked at St. Francis Hospital.  Rather, it was *the trial judge* who said that, *about his own son*.  See Trial Tr. 190.  This is quite clear from the transcript.  Here is the actual exchange:

Q:      You have three grown children.  Can you tell me what each of them do, please, Ms. Dixon?

A:      My daughter is married.  She lives at home.  I have a son, 23 year old son, transporter at Cook County Hospital.  The youngest son is handicapped.

Q:      Did you say transporter?

A:      Yes.

Q:      My son was a transporter at St. Francis Hospital and I am very amazed, they give everybody a rank.  He's got a little badge and picture and whatever that says, I've got to get the initials down, PTT.  That's my son, the Physical Therapy Transporter.  What kind of transporter is your son?

A:    He transports patients.

Trial Tr. 190.  In short, the only particularized additional basis that respondent cites for the prosecutors' strike of Dixon is completely contrived.

*Elester Wilson*.  Finally, respondent offers no particularized explanation for the prosecutor's strike of black prospective juror Elester Wilson, a homeowner who had worked in the same job as a lift-truck operator for sixteen years.

### iii.    Evaluation of respondent's contentions

The Court will confine its discussion regarding whether Richardson has established discriminatory use of peremptory strikes to the eight black jurors regarding whom Richardson's argument is the strongest.  The Court will assess the reasons hypothesized by the prosecution for each of these strikes to determine whether the evidence, circumstantial and otherwise, supports the contention that these were, either together or singly, the actual reasons for each particular strike, or whether there is evidence that hypothesized reasons are pretextual or that otherwise shows a discriminatory purpose.

In making this assessment, the Court has taken into account several factors that apply to all of these jurors.  On one side of the ledger, there are several factors that respondent cites as indicating a lack of discriminatory intent on the part of the prosecutors.  First, the prosecutors did not exclude every black juror.  Indeed, they accepted a total of seven black jurors:  four of the jury of twelve, one alternate, and two whom defense counsel struck.  This indicates that they were not seeking an all-white jury.  But this evidence only carries respondent so far.  Given the number of black prospective jurors who were in the venire generally and, in particular, who were

tendered to the prosecution, they could not have struck all of them even had they wanted to do so. The numbers would have made it clear to the prosecutors that they could not possibly have an all-white jury. And, as previously noted, even if the prosecution struck only one juror based on race, they violated *Batson*. Second, the prosecutors did not use four of their peremptory challenges. This is arguably evidence of a lack of discriminatory intent, at least to the extent it suggests they could have struck more black jurors but did not. But again, it carries respondent only so far. As the jury selection process neared its end, a majority of the prospective jurors still in the room were black.[14] A rational prosecutor intent on limiting the number of blacks on the jury might have believed that continued use of strikes against black jurors would not "improve" the white / black ratio. Third, the prosecutors expressly denied discriminatory intent at the hearing. This is tempered, however, by their lack of memory. Fourth, both testified they had not been the subject of other *Batson* arguments. This is, of course, relevant, but the weight to be given to this factor is questionable.

On the other side of the ledger, though it is understandable (and thus not a significant negative factor) that the prosecutors did not recall their actual reasons for the particular strikes, the fact that respondent offered no evidence of their habit or usual practice regarding the types of jurors they tended to favor and disfavor is disconcerting.

---

[14] Of the four remaining prospective jurors who had already been questioned and thus would have been next in line, three of them were black (Eugenia Glenn, Willie Ramsey, and Huey Williams), and only one was white (Edward Ude). Of the other eleven, two are of unknown race (Cora Dixon and Flora Pruitt), but one of them (Pruitt) may have been excused for cause. *See* Trial Tr. 80. Of the remaining nine, four were black (Dorothy Burnette, Connie Harris, Cheryl Lindsey, and Naomi McGhee, and five were white (Lori Burke, Max Chavez, Nancy Magnuson, Joell Orozco, and Frank Vojcak).

One might have expected that with access to the juror cards and the transcript of the voir dire, respondent could have elicited some evidence on this point. Second, the disparate application of the general hypothesized criteria that are the most supportable in the record is evidence of discriminatory intent. And third, Richardson's "quota" argument is entitled to appreciable weight. His contention is that the prosecutors understood that given the numbers of black jurors and peremptory challenges, they would have to accept some black jurors, but wanted to keep the number as small as possible. The circumstantial evidence tends to provide support for this hypothesis.

There is one factor the Court has not considered. Respondent has made a point throughout these proceedings of noting that Richardson's counsel used eighteen of their twenty peremptory challenges to strike white prospective jurors. That is not an appropriate factor to consider in assessing whether the prosecution discriminated against prospective jurors based on race. There is no principle of law that permits race discrimination in jury selection to "even-up" for the other side's perceived discrimination.

*Crime victim / home ownership / employment status.* With regard to jurors Rosie McGee, Emma Redmond, Roy Tolbert, Judith Smith, Alberta Tucker, Delores Allen, Wanda Dixon, and Elester Wilson, Richardson has shown that the three general criteria hypothesized by respondent (crime victim status, home ownership, and employment status) – assuming those are criteria the trial prosecutors actually applied – were applied in a racially disparate way. This shows one of two things: either that these were not the criteria the prosecutors actually were using, or that they applied them in one way to white jurors (favoring inclusion on the jury) and in a different way to at least some black jurors (favoring exclusion). Either way, the evidence tends to support a

finding of pretext and thus discrimination.

The Court therefore proceeds to assess whether there the record provides support for the contention that the prosecutors had any other race-neutral bases for excluding these jurors. In doing so, the Court has considered the evidence of generally-applicable factors on each side of the ledger as discussed above.

*Rosie McGee, Emma Redmond, Roy Tolbert & Judith Smith*.  Respondent's hypothesized justification that the prosecutors struck prospective jurors McGee, Redmond, Tolbert, and Smith based on their employment or former employment as teachers or social workers is supported by the record.  The prosecutors appear to have exercised a peremptory challenge against every juror with that background, on a consistent basis.  There is no indication that they applied this particular criterion in a disparate fashion based on the juror's race.  The criterion is one that has been recognized in case law and, as the Court has indicated, in conventional wisdom as a basis for believing that a juror is more likely to favor a defendant.

This rationale is hypothesized; it is not supported by any contemporaneous evidence or by the testimony of the trial prosecutors.  But because the circumstantial evidence supports reliance on this factor, the Court finds that it is appropriately considered.  Richardson has failed to show that the proffered rationale is pretextual or was otherwise motivated by a discriminatory purpose.  For these reasons, the Court finds that Richardson cannot sustain his *Batson* claim regarding these four black jurors.

*Alberta Tucker*.  Respondent has suggested two possible rationales for the prosecutors' strike of Alberta Tucker.  The first is the fact that she had a niece who had been murdered.  As discussed earlier, the proposition that the prosecutors relied on this

is unsupported by the record. Alternatively, if this was their actual motivation, their reliance on this with regard to Tucker is indicative of racially disparate treatment, because they did not strike another similarly-situated juror, Irma Blatse, whose niece had also been murdered.[15]

With regard to respondent's other hypothesized rationale – Tucker's allegedly "odd" response to an inquiry – the evidence is close, because the record, fairly read, does not reflect anything odd about Tucker's response. That said, the Court is persuaded by respondent's contention that Richardson has failed to show, though perhaps just barely, that this was not the actual rationale or that it is pretextual.

*Delores Allen*. Respondent's contention that the trial prosecutors struck Delores Allen because she supposedly did not remember whether she had served on the grand jury that indicted Richardson is without support in the record. As the Court discussed earlier, though the record reflects that Allen did not know whether she had been on that grand jury, neither the record nor common sense supports the contention that this was the reason, or a reason, why the prosecutors struck her.

Respondent's only other proffered rationale for striking Allen has to do with her crime victim / home ownership / employment status. This rationale, if it was what the prosecutors actually considered, was applied on a racially discriminatory basis, as the Court has found.

For these reasons, all of respondent's proffered rationales are either

---

[15] Indeed, Tucker was a homeowner (another one of respondent's hypothesized rationales), and Blatse was not. They had been employed for similarly extended periods in similar jobs, and neither had been a crime victim herself. They were therefore similarly situated for purposes of the *Batson* analysis.

unsupportable or pretextual.  Richardson has demonstrated that the prosecutors struck Allen based on her race.

*Wanda Dixon*.  As described earlier, Richardson has shown that the prosecutors did not actually strike Dixon based on her crime victim / home ownership / employment status, or alternatively that their racially-disparate reliance on those grounds was a pretext for race discrimination.  Respondent's only other hypothesized basis for the strike of Dixon -- the claim about her responses to questions about her son's employment – is completely contrived and has no support in the record.  Richardson has demonstrated that the prosecutors struck Dixon based on her race.

*Elester Wilson*.  As with the other jurors, Richardson has shown that the prosecutors did not actually strike Wilson based on his crime victim / home ownership / employment status, or that their reliance on those grounds amounted to disparate use of these criteria against black jurors only.  Respondent has hypothesized no other basis for the prosecutor's strike of Wilson.  Richardson has established that the prosecutors struck Wilson based on his race.

In sum, the Court concludes that Richardson has demonstrated that the trial prosecutors struck no less than three prospective jurors based on their race:  Delores Allen, Wanda Dixon, and Elester Wilson.

This leads to two conclusions.  First, Richardson has established the prejudice element of the cause-and-prejudice analysis.  Thus he has overcome his procedural default of the *Batson* claim.  Second, Richardson is entitled to prevail on the *Batson* claim itself.  Because a racially discriminatory strike of even a single juror violates *Batson*, Richardson is entitled to a new trial.

67

The Court has considered respondent's argument that the state will be unfairly prejudiced if a new trial is ordered so long after George Vrabel's murder. As indicated earlier, the Court acknowledges that it has had this matter under advisement for an inordinately long time since remand. But the short answer to respondent's argument is that none of the delay is attributable to Richardson himself. His state-appointed defense counsel did not assert *Batson* objections, and various courts – the Illinois Supreme Court (twice), the state trial court on post-conviction review, and this Court (again, twice) – had his case under advisement for extended periods. In any event, the passage of time is not a basis for overlooking the prosecutors' violations of the Equal Protection Clause.

## F.    Certificate of appealability

Because of the possibility that respondent may appeal the Court's issuance of a writ of habeas corpus, it must determine whether to issue Richardson a certificate of appealability (COA) on his other claims. To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The petitioner must show "that reasonable jurists could debate whether (or . . . agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court issues a COA on Richardson's claim of ineffective assistance at sentencing, because it believes that reasonable jurists could differ on the question of the state supreme court's reasonable application of *Strickland*. The Court declines to

issue a COA on Richardson's claims regarding the admission of other-crimes evidence and identification testimony. Neither of those claims was at all close.

### Conclusion

Marcus Hardy is substituted as the respondent in this case. For the reasons stated above, the Court denies Richardson's claims regarding the admission of other crimes evidence, the admission of identification testimony, and ineffective assistance of counsel at sentencing. The Court sustains Richardson's claim under *Batson v. Kentucky.* The Court therefore grants Richardson's petition for a writ of habeas corpus and directs respondent to release Richardson unless, within 180 days of this order, he is given a new trial on the charges against him.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 1, 2012